DECISION AND JOURNAL ENTRY
 INTRODUCTION {¶ 1} Craig Maynard was convicted of gross sexual imposition for allegedly having sexual contact with a sleeping 13-year-old girl whose mother had allowed her to sleep in his bed. This Court affirms because: (1) Mr. Maynard's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence; (2) the trial court did not err by not allowing Mr. Maynard's lawyer to question certain witnesses about the veracity of the alleged victim and her mother; and (3) the trial court did not err by stating that it was "going to order a prison sentence in this particular case" before it provided Mr. Maynard an opportunity to speak at his sentencing hearing.
 BACKGROUND {¶ 2} At one time, Mr. Maynard was married to a woman who had two daughters from a prior marriage. During the marriage to Mr. Maynard, the woman and her daughters lived with *Page 2 
him. The alleged victim in this case, B.M., has a half-sister who is five years older than she is. B.M.'s half-sister was a friend of Mr. Maynard's older stepdaughter and would spend time at Mr. Maynard's house with that stepdaughter. Because the stepdaughter also had a younger sister, B.M.'s half-sister would take B.M. along to Mr. Maynard's house.
 {¶ 3} Mr. Maynard also has two sons who are about B.M.'s age. Although they did not live with him during the time relevant to this case, they did have a bedroom at his house they used during visitation with him. B.M. and the sons became friends.
 {¶ 4} Mr. Maynard's marriage with the stepdaughter's mother eventually broke up, but the now former stepdaughter continued to live with him, and B.M. and her half-sister continued to spend time at his house. B.M. testified that Mr. Maynard provided alcohol to his stepdaughter and B.M.'s half-sister, beginning when they were 16 years old. B.M. acknowledged that they shared that alcohol with her, but denied that she ever drank any of it in front of Mr. Maynard.
 {¶ 5} Eventually, Mr. Maynard's former stepdaughter moved out of his house, and B.M.'s half-sister stopped going there. B.M., however, continued going, both when Mr. Maynard's sons were there and when they were not. She testified that Mr. Maynard would buy her pizza, take her out to eat, rent movies for her, allow her to use his computer, and buy her cigarettes.
 {¶ 6} Mr. Maynard's sons spent the summer of 2006 with him, and B.M. testified that, during that summer, she slept at Mr. Maynard's house three or four nights every week. She said that sometimes she would sleep in Mr. Maynard's bed and, when she did, he would sometimes sleep on the couch and sometimes also sleep in his bed. She said she felt comfortable at Mr. Maynard's house. *Page 3 
 {¶ 7} B.M.'s mother, Mrs. B., acknowledged that B.M. spent a lot of time at Mr. Maynard's house. She testified that B.M. had done so with her approval. According to Mrs. B., B.M. had a good relationship with Mr. Maynard. Both she and B.M. testified that B.M. called Mr. Maynard "dad."
 {¶ 8} December 19, 2006, was B.M.'s last day of school before Christmas vacation. She was 13 and in eighth grade. That evening, she and a 16-year-old girlfriend rode with a 17-or 18-year-old boy from their homes in Brunswick to a bowling alley in Strongsville. The other girl testified that the boy was B.M.'s boyfriend, but B.M. denied that.
 {¶ 9} According to B.M., she stole half a bottle of vodka from Mrs. B.'s refrigerator and took it along to the bowling alley. The other girl testified that, when she got in the car with B.M. and the boy, B.M. had an unopened bottle of vodka plus a half-gallon container that was half full of a mixture of orange juice and vodka.
 {¶ 10} According to B.M., nobody drank while they drove to the bowling alley. She said that, when they arrived there, the boy went in the bowling alley and she and her girlfriend stayed in the car and drank the half bottle of vodka. She testified that her girlfriend drank a little more than she did.
 {¶ 11} The girlfriend agreed that the boy did not drink any of the vodka. She testified, however, that she and B.M. drank as they drove to the bowling alley and then stayed in the car and continued drinking while the boy was bowling. According to her, she and B.M. first drank the vodka and orange juice mixture and then started drinking the undiluted vodka from the bottle. She said that they drank about three quarters of the bottle.
 {¶ 12} The girlfriend threw up in the car on the way home. When they arrived at her house, B.M. helped her inside. The girlfriend's mother became upset about her daughter's *Page 4 
condition and instructed B.M. to telephone Mrs. B. and have her come pick B.M. up. Instead, B.M. called Mr. Maynard. The girlfriend's mother took B.M.'s phone from her and told Mr. Maynard to call Mrs. B. and have her come to the girlfriend's house, which he did. Mr. Maynard arrived at the girlfriend's house about five minutes before Mrs. B. did.
 {¶ 13} The girlfriend's mother took her to the hospital, in part because she was convinced that she had ingested something other than just alcohol. Apparently, the medical personnel determined that she had only drunk alcohol.
 {¶ 14} Mrs. B. testified that B.M. did not appear intoxicated; B.M. testified that she was "nowhere near tipsy or drunk"; B.M.'s girlfriend's mother testified that B.M. "wasn't focused" and, she believed, was drunk. B.M. told Mr. Maynard and Mrs. B. that she did not want to go home because she was afraid her stepfather would be angry. The three of them, therefore, went to Mr. Maynard's house, B.M. riding with Mr. Maynard and Mrs. B. driving separately.
 {¶ 15} After they got to Mr. Maynard's house, he left again, going to a store and buying bread and Sprite for B.M. He told her they would help absorb the alcohol she had drunk.
 {¶ 16} According to B.M., Mr. Maynard and Mrs. B. lectured her "for about ten minutes, if that," and then they just started "discussing things." After a while, B.M. went into Mr. Maynard's bedroom, where he kept his computer, and accessed the internet. Mr. Maynard and Mrs. B. continued talking. At some point, B.M. told them she was lying down, which she did on Mr. Maynard's bed.
 {¶ 17} Mrs. B. testified that, at some time around 3:00 a.m., she went into Mr. Maynard's bedroom to get B.M. so they could go home. She said that B.M. is a heavy sleeper and, when Mrs. B. "lifted up her arm[,] . . . it flopped down." According to Mrs. B., Mr. Maynard said: "If you want to just leave her here, when she gets up in the morning I'll give you *Page 5 
a call and I'll let you know when she gets up." Mrs. B. went home, leaving B.M. asleep in Mr. Maynard's bed. The activity that led to Mr. Maynard's conviction allegedly took place a few hours later.
 SUFFICIENCY {¶ 18} Mr. Maynard's first assignment of error is that his conviction is not supported by sufficient evidence and is against the manifest weight of the evidence. Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo. State v.Thompkins, 78 Ohio St. 3d 380, 386 (1997); State v. West, 9th Dist. No. 04CA008554, 2005-Ohio-990, at ¶ 33. This Court must determine whether, viewing the evidence in a light most favorable to the prosecution, it would have convinced an average juror of Mr. Maynard's guilt beyond a reasonable doubt. State v. Jenks, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).
 {¶ 19} Mr. Maynard was convicted of violating Section 2907.05(A)(5) of the Ohio Revised Code by having sexual contact with a person, other than his spouse, while the other person's ability to resist or consent was "substantially impaired because of a mental or physical condition . . . and the offender [knew] or [had] reasonable cause to believe that the ability to resist or consent of the other person . . . [was] substantially impaired because of a mental or physical condition. . . ." "Sexual contact" is defined by Section 2907.01(B) of the Ohio Revised Code as "any touching of an erogenous zone of another . . . for the purpose of sexually arousing or gratifying either person."
 {¶ 20} B.M. testified that she awoke before 5:30 a.m. the morning after her mother left her sleeping in Mr. Maynard's bed to find her jeans and underpants down around her knees and *Page 6 
Mr. Maynard on the bed beside her rubbing her vagina with his hand. She said she got up, pulled her pants up, ran to the living room, told Mr. Maynard he disgusted her, and left the house.
 {¶ 21} B.M. went to a girlfriend's house, where she spent the day. She told the girlfriend about Mr. Maynard's alleged sexual contact with her, but asked the girlfriend not to tell anybody else. That evening, the girlfriend told B.M.'s older half sister, who told Mrs. B. Mrs. B. and the half sister reported it to police, and eventually convinced B.M. to talk to the police about it.
 {¶ 22} Mr. Maynard has suggested that the evidence was not sufficient to prove that B.M. was intoxicated enough to prevent her from resisting his alleged sexual contact. Whether she was intoxicated, however, is irrelevant in view of her testimony that he was engaged in sexual contact with her when she awoke. As held by the Eighth District Court of Appeals in State v. Grant, 8th Dist. No. 86220, 2006-Ohio-177, at ¶ 33, sleep is a "mental or physical condition" sufficient to substantially impair a victim's ability to resist unwelcomed sexual contact within the meaning of Section 2907.05(A)(5).
 {¶ 23} B.M.'s testimony, if believed, would have convinced an average juror, beyond a reasonable doubt, that Mr. Maynard engaged in sexual contact with her while she was sleeping. To the extent that his first assignment of error is addressed to the sufficiency of the evidence, it is overruled.
 MANIFEST WEIGHT {¶ 24} When a defendant argues that his conviction is against the manifest weight of the evidence, this Court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten, *Page 7 33 Ohio App. 3d 339, 340 (1986). Essentially, Mr. Maynard has argued that B.M.'s testimony was not believable.
 {¶ 25} Mr. Maynard did not testify on his own behalf. He has, however, pointed to numerous inconsistencies between B.M.'s testimony and that of other witnesses, along with examples of lies she admitted telling, as reasons why her testimony should not have been believed. He has pointed out that she claimed she was not drunk when she returned to her drinking companion's house, while the drinking companion's mother testified that she was. While she claimed she and her companion drank half a bottle of vodka, her companion testified that they drank three-quarters of a bottle of vodka on top of a quart of an orange juice and vodka mixture. She originally told her mother that she and her companion found the vodka they drank at the bowling alley, but later said she had taken it from her mother's refrigerator.
 {¶ 26} Mr. Maynard submitted material from B.M.'s My Space page that seems to imply she uses drugs, although she denied that she did. She acknowledged that she lied about her age when she opened her My Space account, saying that she was 17 when she was 12 or 13. Mr. Maynard has suggested that B.M. made up the story about his alleged sexual contact with her to avoid being punished by her stepfather for drinking.
 {¶ 27} There is no doubt that B.M. and the truth are not well acquainted. Despite that, this Court cannot conclude that the jury lost its way and created a manifest miscarriage of justice by believing her testimony that Mr. Maynard had sexual contact with her. The jury could have reasonably rejected Mr. Maynard's suggestion that she made up the story to avoid punishment for drinking. When she had been caught drinking before, her punishment consisted only of being grounded for two weeks. Further, on the evening of the day on which Mr. Maynard allegedly had sexual contact with her, she was out with two friends at Applebee's. If she was going to be *Page 8 
punished at all, therefore, the punishment was not swift in coming. Considering that Mrs. B. allowed her to go to Mr. Maynard's house the night she was caught drinking in order to avoid a confrontation with her stepfather, it was not clear that B.M. was going to receive any punishment beyond the ten-minute lecture she had already received. The jury could have reasonably concluded that B.M. would not have given up her source for cigarettes, among other things, to avoid punishment that it was not clear was coming and that, if it did come, would probably be light.
 {¶ 28} Having reviewed and weighed the evidence, this Court cannot say the jury lost its way and created a manifest miscarriage of justice by believing B.M.'s testimony that Mr. Maynard had sexual contact with her while she was sleeping. To the extent that his first assignment of error is addressed to the weight of the evidence, it is overruled.
 TESTIMONY ABOUT TRUTHFULNESS {¶ 29} Mr. Maynard's second assignment of error is that the trial court incorrectly prevented him from questioning witnesses about Mrs. B.'s and B.M.'s veracity. At trial, Mr. Maynard's lawyer asked the mother of B.M.'s drinking companion if she had an opinion about whether Mrs. B. was a truthful person, and the trial court sustained the State's objection. He also asked her if she had an opinion about whether B.M. was a truthful person, and the trial court again sustained the State's objection. Finally, he asked the drinking companion if she had an opinion about whether B.M. was a truthful person, and the trial court again sustained the State's objection. After completion of all the evidence, Mr. Maynard's lawyer proffered that he would have asked both witnesses whether they "believe she's going to be truthful" and that he believed they both would have answered no. *Page 9 
 {¶ 30} Under Rule 608(A) of the Ohio Rules of Evidence, the credibility of a witness may be attacked by opinion testimony about the witness's character for untruthfulness. Before a particular witness can provide such opinion testimony, however, the questioner must lay a proper foundation. See State v. Lee, 11th Dist. No. 95-T-5371,1997 WL 835072 at *9 (Dec. 31, 1997).
 {¶ 31} Before asking B.M.'s drinking companion's mother if she had an opinion about Mrs. B.'s truthfulness, Mr. Maynard's lawyer asked her whether she knew Mrs. B., and she responded that she did, that they had spoken. He then asked how many times they had spoken, and she responded "[p]robably under ten times."
 {¶ 32} The trial court did not err by sustaining the State's objection to Mr. Maynard's lawyer's question to the drinking companion's mother about whether she had an opinion regarding whether Mrs. B. was a truthful person. Less then ten conversations with a person is not an adequate foundation for an opinion regarding whether that person has an untruthful character.
 {¶ 33} Further, when Mr. Maynard's lawyer proffered the question he said he intended to ask both the mother and the drinking companion, he said it was going to be: "Do you believe she's going to be truthful?" That question did not call for the witness's opinion about whether Mrs. B. and B.M. had untruthful characters, as is permissible under Rule 608(A), but rather called upon them to say whether Mrs. B. and B.M. testified truthfully at Mr. Maynard's trial. That determination was for the jury, and that kind of testimony is inadmissible. See State v.Burrell, 89 Ohio App. 3d 737, 744-745 (1993).
 {¶ 34} Even if it could be concluded that the trial court erred by not allowing the mother to give her opinion about whether Mrs. B. has an untruthful character, that error would have been harmless beyond a reasonable doubt. The only issue on which Mrs. B.'s credibility was in *Page 10 
question was whether B.M. was drunk on the evening before the alleged sexual contact. Mrs. B. said she did not appear to be drunk, and the drinking companion's mother said she did appear to be drunk. This Court has already determined that it did not matter whether B.M. was drunk because she was asleep. Even if it did matter, it would seem that Mr. Maynard would want to bolster Mrs. B.'s testimony that M.B. did not appear to be drunk rather than impeach that testimony.
 {¶ 35} Before asking the mother if she had an opinion about whether B.M. was a truthful person, Mr. Maynard's lawyer elicited from her that she had had contact with B.M. "[m]any, many, many times." Similarly, he elicited from the drinking companion that she had known B.M. for two-and-a-half years, saw her "quite a bit," talked to her "quite a bit," and hung out with her. He did, therefore, establish a proper foundation for their opinions about whether B.M. had a truthful character. That did not, however, make that evidence automatically admissible.
 {¶ 36} Under Rule 403(B) of the Ohio Rules of Evidence, a trial court has discretion to exclude relevant evidence "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." This Court cannot say that the trial court abused its discretion by preventing the witnesses from responding to the question of whether they had an opinion. It was already clear from other testimony before the jury that B.M. did not have a truthful character, and allowing these two witnesses to express their opinions to that effect would have added little. The critical issue in this case was whether B.M. lied about Mr. Maynard's alleged sexual contact with her. She had little or nothing to gain by lying about that and would lose all the things Mr. Maynard had up till that time supplied her.
 {¶ 37} Besides, taking Mr. Maynard's lawyer at his word, he did not intend to ask these witnesses what their opinion of B.M.'s character was, but rather whether they believed she *Page 11 
testified truthfully. That was an improper question. Mr. Maynard's second assignment of error is overruled.
 ALLOCUTION {¶ 38} Mr. Maynard's final assignment of error is that the trial court incorrectly determined that it would sentence him to incarceration before providing him his right of allocution. Prior to 1998, Rule 32(A)(1) of the Ohio Rules of Criminal Procedure specifically provided that, "[b]efore imposing sentence" on a defendant, a trial court is required to "address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." The current rule does not clearly require the trial court to address the defendant "before imposing sentence." Rather, as a result of a 1998 amendment, Rule 32(A)(1) now requires the trial court, "[a]t the time of imposing sentence," to address the defendant "personally" and "ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." In State v. Campbell,90 Ohio St. 3d 320, 323 n. 1 (2000), a case that dealt with the requirement that a trial court address the defendant before imposing sentence, the Ohio Supreme Court wrote that the 1998 amendment "did not affect [Rule 32(A)(1)'s] substance." Despite the 1998 language change, therefore, Rule 32(A)(1) still requires a trial court to afford a defendant an opportunity to speak before the court imposes sentence.
 {¶ 39} The trial court held Mr. Maynard's sentencing hearing on November 19, 2007, a little over a month before the effective date of the Adam Walsh Act in Ohio. On that day, the trial court first held a sex-offender-classification hearing in order to determine whether Mr. Maynard was a sexually oriented offender, a habitual sex offender, or a sexual predator under then existing Chapter 2950 of the Ohio Revised Code. As it did so, it consulted a document *Page 12 
published by the Ohio Judicial Conference captioned "Quick Reference Guide for Sex Offender Sentencing from July 1, 2007, through December 31, 2007." The document outlined different steps a court should take regarding sex-offender classifications, depending upon whether it was going to sentence a defendant to a prison term. If it was going to sentence the defendant to a prison term, no steps beyond determining the defendant's classification were required. If it was not going to impose a prison term, it needed to take certain additional steps to comply with the then existing law.
 {¶ 40} At the conclusion of the sex-offender-classification hearing, the trial court announced that it was classifying Mr. Maynard as a habitual sex offender. It then noted that, because it planned to sentence Mr. Maynard to prison, in accordance with the guide, it did not need to take any additional steps: "The Court is going to order a prison sentence in this particular case, and since I'm making that determination, I'm not going to take any further steps."
 {¶ 41} Despite saying it was not going to take any additional steps, the trial court did proceed to discuss some of the requirements of the then effective law and provide Mr. Maynard, through his lawyer, "the old forms." At that point, Mr. Maynard's lawyer suggested he was confused by the court's statement that it was going to impose a prison term: "I'm at a loss with this procedure because it determines — the Court's determined that a prison sentence, by making its findings earlier, is going to be administered in the case, which makes, I think, allocution at this point rather moot." His lawyer then proceeded to make an argument that the court should impose a community control sanction on Mr. Maynard rather than a prison sentence.
 {¶ 42} The trial court explained that it had not finally determined that it would sentence Mr. Maynard to prison: *Page 13 
 The law apparently requires me, from July 1 of 2007 until December 31, `07, to conduct a sexual predator determination and then to determine whether the Defendant will be sentenced to a prison term.
 That is my current thought, it is the recommendation of the probation department, however, as we proceed through allocution, the sentence is not set in stone. I will listen to anything you want to tell me, and I can change my feelings with regard to this up until the time I issue sentence. So no, I haven't made that determination at this time, and I am willing to listen to anything else you want to say. I don't want to foreclose your ability to allocate or make any argument you want to make with respect to sentence. My determination with regard to sentence at this time is based only on the requirement that the law is apparently making me do as a condition of the Adam Walsh Act, that I must then proceed to give him his Tier I, II, and III classifications, his release dates, written notification, notice of the current law as it exists pre-AWA, changes in Chapter 2950, that will take us to January 1, 2008, which include what his duties are under that classification and to hand him, in quadruplicate, copies of the information that would have been provided to him otherwise.
 I'll do that if I need to do so, if I make the determination that, in fact, a prison sentence is proper in this case.
 So I want to note for the record that I haven't made this determination at this time. The only reason I did so was because that was the initial recommendation of the probation department.
 Is there anything you want to tell me? I'm certainly willing to listen.
Mr. Maynard's lawyer again expressed concern about whether the court had already made a determination to impose a prison term, made some additional points in favor of community control, explained that Mr. Maynard "has to stand here rather moot" because he intended to appeal, and asked the court "to go forward with its sentencing."
 {¶ 43} The court repeated that it had not made a predetermination, repeated that it would listen to anything Mr. Maynard's lawyer wished to say, and then asked Mr. Maynard if there was anything he wanted to tell the court. Mr. Maynard responded that there was not. The court then asked the prosecutor if there was anything he wished to say, and the prosecutor argued in favor of a sentence exceeding the minimum. M.B.'s grandmother spoke in favor of incarceration. *Page 14 
 {¶ 44} The trial court reiterated that it had not made up its mind regarding sentencing until it had heard from everyone who wanted to speak, "including listening to the attorney for the Defendant, the State of Ohio, and the victim's representative." It then announced that it would sentence Mr. Maynard to a one-year prison term and give him credit for 68 days he had already served.
 {¶ 45} The trial court had sat through Mr. Maynard's trial, heard all the evidence against him, and received the jury's verdict. It would defy logic to suggest that it was prohibited from beginning the process of deciding whether his sentence would include incarceration until the instant it announced what that sentence would be. As explained by the trial court, that process had led it to believe, by the time it classified Mr. Maynard as a habitual sexual offender, that his sentence would likely include incarceration, but it did not finally reach that conclusion until after Mr. Maynard's lawyer had an opportunity to argue that his sentence should be limited to community control and until after it gave Mr. Maynard an opportunity to speak on his own behalf. In fact, Mr. Maynard's sentence was not finalized until the trial court filed its sentencing entry and, up until that time, anything it said about what that sentence would be was tentative. State v. Richards, 9th Dist. No. 23968, 2008-Ohio-5237, at ¶ 12. The trial court did not violate Rule 32(A)(1) of the Ohio Rules of Criminal Procedure by stating during the sexual-offender-classification hearing that, at that point, it tentatively believed the sentence it would impose would include incarceration. Mr. Maynard's third assignment of error is overruled.
 CONCLUSION {¶ 46} Mr. Maynard's assignments of error are overruled. The judgment of the *Page 15 
Medina County Common Pleas Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to appellant.
WHITMORE, J. CONCURS
 CARR, P. J. CONCURS IN JUDGMENT ONLY *Page 1