[Cite as *State v. Porter*, 2013-Ohio-3969.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | C.A. No. 12CA0061-M |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| STEVEN E. PORTER | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No. 11CR0479 |

DECISION AND JOURNAL ENTRY

Dated: September 16, 2013

WHITMORE, Judge.

{¶1} Defendant-Appellant, Steven Porter, appeals from the judgment of the Medina County Court of Common Pleas. This Court affirms.

I

{¶2} On August 6, 2011, Porter, his wife, Katie, and their two children attended the wedding of his step-brother, Josh. Also in attendance were brothers Matt and Jessie Shorter, and C.S. Matt and Jessie are Porter's cousins by marriage. C.S. is Matt and Jessie's sister and was 13 years old at the time.

{¶3} After the wedding reception, Porter invited Josh, another step-brother, Jake, and their wives over to his house for an after-party. Josh asked if Matt and Jessie could come along, to which Porter had no objection. Matt and Jessie volunteered to bring the remaining keg of beer over to Porter's after they dropped C.S. off at home. After receiving permission from her father, C.S. decided to go along with her brothers to Porter's house.

{¶4} While waiting for Josh to bring the tap for the keg, Porter pulled out a bottle of 101 proof peppermint schnapps, a bottle of tequila, and three shot glasses. According to C.S., Porter gave her shots of the peppermint schnapps. However, none of the witnesses at trial admitted to seeing C.S. drinking any alcohol that evening. Josh and his new wife left first, followed by Jake and his wife. Matt, Jessie, and C.S. intended to spend the evening because Matt and Jessie were too drunk to drive.

{¶5} Katie Porter testified that she went upstairs to bed around 12:00 or 12:30 a.m. Not long after, Jessie, Matt, C.S., and Porter lay down in the living room to sleep. Matt was sitting in a reclining chair, while the others were on the "L" shaped sectional couch. Porter was lying on the long portion that forms the bottom of the "L," C.S. was lying with her feet toward Porter's head, and Jessie was sitting at the end of the couch near C.S.'s head.

{¶6} Jessie testified that he woke when he heard Matt get out of the chair and go to the bathroom to throw up. He then noticed that C.S. had slid down the couch toward Porter and was quietly moaning. Jessie said that he picked up the blanket covering C.S. and saw that C.S. was disrobed and that Porter's hand was touching her bare vagina.

{¶7} Jessie testified that he tried to alert his brother Matt, and eventually called 911 while standing in the bathroom with Matt. He hung up the phone with the dispatcher when Porter opened the bathroom door. Matt and Jessie then went outside, and Jessie called the police again.

{¶8} Officer Matthew Heidelman of the Seville Police Department was the first officer on scene. Officer Heidelman testified that C.S. "was passed out or sleeping" on the couch when he entered the living room. He began asking her questions and "could tell something just wasn't right. Her speech was somewhat * * * slurred. She just wasn't very coherent, [and] couldn't

really make out what had happened." Detective Kevin Ross arrived shortly thereafter and began interviewing C.S. Detective Ross testified that C.S. was intoxicated when he spoke to her and that she "was out of it." Detective Ross further testified that C.S. told him that Porter had given her alcohol.

{¶9} C.S. testified that Porter had given her two or three shots of peppermint schnapps and that the last thing she remembered was sitting on the couch with Porter. She remembered Porter had his hand on her leg and asked her if she was okay. The next thing she knew Officer Heidelman was waking her. She testified that she did not remove her skirt, underwear or bra and was unaware that they were off until the officer brought it to her attention.

{¶10} Porter was indicted on two counts of gross sexual imposition ("GSI"), in violation of R.C. 2907.05(A)(1) and R.C. 2907.05(A)(5), both felonies of the fourth degree. At trial, the court granted Porter's Crim.R. 29 motion and dismissed the count related to R.C. 2907.05(A)(1). The jury found Porter guilty of the remaining GSI charge, and the court sentenced him to one year in prison. Porter now appeals and raises three assignments of error for our review.

II

Assignment of Error Number One

THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY VERDICT OF GUILTY OF GROSS SEXUAL IMPOSITION, PURSUANT TO R.C. §2907.05(A)(5), AND THAT SAID JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶11} In his first assignment of error, Porter argues that the evidence is insufficient to sustain his conviction for GSI. Additionally, Porter argues that his conviction is against the manifest weight of the evidence.

**Sufficiency**

{¶12} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶13} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

{¶14} R.C. 2907.05(A)(5) provides, in relevant part, that:

> No person shall have sexual contact with another, not the spouse of the offender; [or] cause another, not the spouse of the offender, to have sexual contact with the offender * * * when * * * [t]he ability of the other person to resist or consent * * * is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person * * * is substantially impaired * * *.

{¶15} The General Assembly did not define the phrase "substantially impaired" as used in R.C. 2907.05. *See State v. Zeh*, 31 Ohio St.3d 99, 103 (1987). "In the absence of clear legislative intent to the contrary, words and phrases in a statute shall be read in context and construed according to their plain, ordinary meaning." (Quotations omitted.) *Barton v. G.E. Baker Constr., Inc.*, 9th Dist. Lorain No. 10CA009929, 2011-Ohio-5704, ¶ 10. "[S]ubstantial impairment must be established by demonstrating a present reduction, diminution or decrease in

the victim's ability, either to appraise the nature of his conduct or to control his conduct." *Zeh*, 31 Ohio St.3d at 103-104.

{¶16} Porter argues that the State failed to produce sufficient evidence to establish that C.S. was substantially impaired by alcohol. Further, according to Porter, there is no evidence that he knew or had reasonable cause to believe that C.S. was substantially impaired. Because Porter limits his argument to this element, we will limit our review accordingly.

{¶17} C.S. testified that when they arrived at Porter's everyone started drinking. When she asked if she could have a drink, Porter offered her shots of 101 proof peppermint schnapps. C.S. described the curvy shot glass she used and explained that Porter instructed her to drink the shot fast because it would "taste really bad." She thought Porter gave her a total of two or three shots. C.S. further testified that the last thing she remembered was sitting on the couch with Porter and him "leaning back and touching [her] leg and asking if [she] was okay." When she woke she had a blanket over her and a police officer was there. C.S. explained that she still felt drunk and was unaware that her clothes were off until the police brought it to her attention.

{¶18} Jessie Shorter testified that when he fell asleep on the couch next to C.S., her head was up against his leg. He was woken sometime later when Matt got up from the recliner to go to the bathroom. At that time, Jessie noticed that C.S. had moved a couple of feet away from him and toward Porter. Jessie heard C.S. moaning quietly, and when he raised her blanket he noticed she was nude from the waist down and Porter's hand was on her bare vagina. Construing the facts in a light most favorable to the State, there is sufficient evidence that C.S. was substantially impaired and Porter knew it.

{¶19} However, regardless of whether C.S. had consumed enough alcohol to become substantially impaired, the testimony of C.S. and Jessie, if believed, presents sufficient evidence

to establish that Porter had sexual contact with C.S. while she was sleeping. We have previously held that "sleep is a 'mental or physical condition' sufficient to substantially impair a victim's ability to resist unwelcomed sexual contact within the meaning of [R.C.] 2907.05(A)(5)." *State v. Maynard*, 9th Dist. Medina No. 07CA0116-M, 2009-Ohio-282, ¶ 22. Viewing the evidence in a light most favorable to the State, we conclude that there is sufficient evidence to establish, beyond a reasonable doubt, that Porter had sexual contact with C.S. while she was substantially impaired. Porter's first assignment of error, as it relates to insufficiency, is overruled.

**Manifest Weight**

{¶20} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387; *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Thompkins* at 387, quoting *Black's* at 1594.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

### a. Porter's Testimony

{¶21} Porter testified that he returned home from the wedding about 9:30 or 10 p.m. He said that he and his wife put the kids to bed and changed into more comfortable clothes before everyone arrived. Porter maintained that he never personally gave C.S. any alcohol and did not witness her drinking at any point that evening. He further testified that while they were sleeping he shoved C.S.'s feet a couple of times because she was kicking him, but denied that he ever had any sexual contact with her.

### b. Jessie's Testimony

{¶22} Jessie testified that he woke when Matt got out of the recliner to go to the bathroom. Jessie noticed that C.S. had slid closer to Porter and he could hear her moaning softly. When he lifted her blanket, he saw that C.S. was undressed from the waist down and that Porter's hand was on her vagina. Jessie testified that he tried to communicate with Matt by text message, but Matt's responses were incoherent. Jessie then went to the bathroom to talk to Matt. Jessie explained that he did not confront Porter because Porter is much bigger and he worried about getting hurt if the two fought. Additionally, Jessie stated that he was on probation and feared that he could get into legal trouble if he was involved in any physical altercation. Ultimately, Jessie decided to call 911 while in the bathroom with Matt. On the 911 tape, Jessie can be heard whispering to the 911 operator that his cousin was sexually assaulting his sister with his finger. He ended the call abruptly when Porter came into the bathroom to see what was going on. Jessie told Porter that Matt was throwing up and suggested to Matt that they go outside to smoke. Once outside Jessie called 911 again.

### c.  Officer Heidelman's Testimony

**{¶23}**  Officer Matthew Heidelman of the Seville Police Department was the first officer to arrive on scene.  He testified that he noticed Matt standing in the driveway and asked him what was going on.  Matt replied that he did not know and told him to speak with Jessie, who had walked a ways down the road.  Before Officer Heidelman had a chance to speak to Jessie, Porter came out of the house cursing and yelling for him to get off of his property.  Officer Heidelman testified that Porter approached him in "an aggressive posture" and would not calm down.  Officer Heidelman then drew his taser and ordered Porter to lie on the ground.  Porter instead walked to the cruiser and placed his hands on the hood.  When Officer Heidelman attempted to handcuff Porter he noticed that his hands were wet.  When backup arrived, Porter was handcuffed and placed in the back of a cruiser so the officers could figure out what was going on.

**{¶24}**  Officer Heidelman then spoke with Jessie.  He testified that Jessie appeared "very upset, almost hysterical."  Jessie was crying and it took a couple of minutes to calm him down.  Officer Heidelman was then met by Katie Porter at the front door of the house.  He asked to speak to C.S. and Katie led him into the living room, where he noticed C.S. was either passed out or sleeping on the couch.  While speaking with C.S., Officer Heidelman noticed some women's clothing on the couch next to her.  He testified that he "could tell something just wasn't right."  He explained that her speech was a little slurred and she "just wasn't very coherent."  Detective Ross arrived shortly thereafter and took over the interview with C.S.

### d.  Detective Ross' Testimony

**{¶25}**  According to Detective Ross, C.S. appeared to be intoxicated when he spoke with her.  She had no memory of going to sleep on the couch or how her clothes were removed.

According to Detective Ross, she told him that Porter had given her some shots of peppermint schnapps and that she did not remember much of anything else. Katie testified that she overheard Detective Ross' interview with C.S. and that C.S. repeatedly said that it was Matt and Jessie that gave her alcohol, not Porter. Katie also testified that C.S. did not appear intoxicated during her interview with Detective Ross.

### i.    Underwear

{¶26}  In processing the scene, the police discovered a pair of men's underwear under the portion of the couch where Porter was sleeping. Porter was transported to the police station for questioning. In the interview, Detective Ross asked Porter about the underwear under the couch. Porter explained that he did not know how the underwear got under the couch, but that he had sex there earlier that day with his wife and would not be surprised if more than one pair of his underwear was found under the couch. He further explained that he was not currently wearing underwear and that that was not uncommon.

{¶27}  According to Porter, he had removed his underwear when he changed into more comfortable clothes after the wedding, despite knowing company was coming over. Katie Porter also testified that Porter often goes without underwear at home. She also said that the underwear could have fallen under the couch while she was doing laundry. Katie explained that she often folds laundry on the couch so there are always miscellaneous articles of clothing under the couch. Additionally, Katie testified that it is possible that the police planted the underwear there.

### ii.    Wet Hands

{¶28}  In the interview Detective Ross also asked Porter why his hands were wet when Officer Heidelman tried to handcuff him. Porter explained that he woke up when he heard Matt and Jessie moving about. He went to see if everything was okay. Jessie told him everything was

fine and that Matt was just throwing up. According to Porter, the three then walked outside so that Jessie and Matt could smoke. Shortly thereafter, Porter came back inside, sat on the couch for a minute, and decided to clean up the kitchen. According to Porter, he picked up a shot glass from the kitchen's center island, but put it right back down because it was sticky. He then went and washed his hands. At that point, he noticed lights in his driveway and went outside. Porter explained that he was confrontational and uncooperative at first because he did not know who was in his driveway or why. He thought maybe Matt and Jessie had gotten into a fight.

### iii. Shot Glasses

{¶29} Detective Ross testified that three shot glasses, an empty bottle of 101 proof peppermint schnapps, and a bottle of tequila were found in the laundry room on top of the dryer. The shot glasses were dirty and smelled like peppermint schnapps. During the interview with Porter, Detective Ross informed Porter that his version of the events did not add up because the shot glasses were not found where he said he left them. Porter maintained that he left the dirty shot glasses on the island in the kitchen. At trial, Katie Porter testified that she had moved the liquor bottles and shot glasses to the laundry room after the officers arrived. She admitted that she did not tell the police that she moved these because nobody asked. She explained that she did not know what she was doing; she was stressed and just started cleaning. She testified that the only cleaning she did was move dirty shot glasses to the laundry room. She did not clean the sink full of dirty dishes or put away the carton of orange juice that had been sitting on the counter since earlier that evening.

### iv. Tissues

{¶30} The police also found a couple of bloody Kleenexes under the couch near where Porter was sleeping. Porter and Katie testified that they did not know where the Kleenex came

from and that they did not have any in the house. The tissues were collected as evidence, but no DNA testing was performed on them.

### e. DNA Evidence

{¶31} Several items were submitted for DNA testing. Among the things tested were swabs from C.S.'s underwear. Y chromosome DNA testing of C.S.'s underwear revealed a major and minor male profile. The major profile only produced a partial profile, containing just 3 of 17 markers. The source of the minor profile was too small to test. A comparison of Porter's DNA to the major Y chromosome profile determined that he could not be excluded as a contributor. However, because it was only a partial profile, statistically the profile could be consistent with about 10% of the male population. The State did not take DNA samples from Jessie or Matt.

{¶32} Also submitted for DNA analysis were swabs from Porter's hands. His right hand revealed a minor DNA profile, but it was too small to test. No DNA was recovered from the swab of Porter's left hand.

### f. Social Worker's Testimony

{¶33} The police had C.S. transported to Akron Children's Hospital from Porter's house for examination. Prior to her medical examination, Ms. Tyla Dudley, a social worker from Akron Children's Hospital, interviewed her. Ms. Dudley testified that she had to wait to interview C.S. because of her level of intoxication. When she did speak to C.S., C.S. told her that she drank, passed out, and woke up to the police standing in front of her. Ms. Dudley testified that C.S. told her that her brothers had put her on the couch because she was falling over and that was one of the last things she remembered.

### g. C.S.'s Testimony

{¶34} C.S. testified that Porter gave her two or three shots of peppermint schnapps and that the effects of the alcohol hit her all of a sudden. The last thing she remembered was sitting on the couch with Porter. His hand was on her leg and he was asking her if she was okay. C.S. testified that she had no idea how her skirt, underwear, and bra were removed. She also stated that she had no memory of her vagina being touched.

### h. Conclusion

{¶35} Essentially, the jury was presented with two different versions of the events, one from Jessie and one from Porter. The jury was left to decide which version it believed. "[C]redibility determinations are primarily for the trier of fact." *State v. Browning*, 9th Dist. Summit No. 26687, 2013-Ohio-2787, ¶ 18. Here, the jury chose to believe Jessie's version of the events over that of Porter's. "[T]his Court will not overturn [a jury's] verdict on a manifest weight of the evidence challenge simply because the [jury] chose to believe certain witnesses' testimony over the testimony of others." *Id.*, quoting *State v. Ross*, 9th Dist. Wayne No. 12CA0007, 2013-Ohio-522, ¶ 16. After a careful review of the record, we conclude that this is not the exceptional case where the jury clearly lost its way and created such a manifest miscarriage of justice by convicting Porter. *See Otten*, 33 Ohio App.3d at 340. Porter's first assignment of error, as it relates to the manifest weight of the evidence, is overruled.

Assignment of Error Number Two

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶36} In his second assignment of error, Porter argues that his trial counsel was ineffective. Specifically, Porter argues his trial counsel was ineffective for failing to: (1) call a

DNA expert to testify; (2) call Jessie's father to testify; (3) plea bargain based upon Jessie's alleged confession to his father; (4) present extrinsic evidence of Detective Ross' bias; and (5) correct his witness' testimony.

{¶37} To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Accord State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. This Court need not address both *Strickland* prongs if the defendant has failed to prove either one. *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10. In a direct appeal, we review a claim of ineffective assistance of counsel de novo. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 53

{¶38} Porter argues that his counsel was ineffective for failing to call his own DNA expert to testify at trial. According to Porter, he had "engaged the services of a DNA expert" and that expert "contradicted the findings of fact[] and conclusions of the State's DNA expert." Because Porter's argument relies on evidence outside of the record, it is more appropriate for a petition for post-conviction relief. *See State v. Malone*, 9th Dist. Lorain No. 12CA010153, 2013-Ohio-2605, ¶ 19. Based on the information contained in the record, we cannot conclude that Porter was prejudiced by his attorney's failure to present testimony from his DNA expert.

{¶39} Next, Porter argues his counsel was ineffective for failing to call Jessie's father to testify. According to Porter, Jessie's father was prepared to testify that Jessie confessed to him that Porter did not have sexual contact with C.S. Again, these arguments are based on information dehors the record and are more appropriate for a petition for post-conviction relief. Reviewing the record, we cannot determine what Jessie's father would have testified to at trial.

As such, Porter cannot establish that his attorney was ineffective for failing to call Jessie's father as a witness.

{¶40} Additionally, Porter argues that his counsel was ineffective for failing to plea bargain based on Jessie's confession to his father. The State argues in its brief that it did offer Porter a plea deal. However, because the offer is not part of the record, we have nothing to review. Further, there is no evidence in the record regarding plea bargains. Because Porter's argument is based on information outside of the record, it is better suited to a petition for post-conviction relief.

{¶41} Porter further argues that his counsel was ineffective for failing to present extrinsic evidence of Detective Ross' bias. During his cross examination of Detective Ross, defense counsel asked if he remembered during the lunch recess saying "so pathetic" as he was walking past Porter. Detective Ross replied that he did not remember saying that, and the court removed the jury. Defense counsel explained to the court that he did not personally hear the statement, but was informed by an observer in the courtroom. When asked if he planned to call the observer as a witness, defense counsel replied that he would have to talk to her again and that there may be more than one "alleged witness." The prosecutor told the court that he was with Detective Ross the whole time and at no point was any comment made toward Porter. The court brought the jury back in and instructed them to disregard the defense's question. The court concluded that if it "were to permit examination of this topic, it would lead, perhaps, to collateral matters which would prolong the trial and not get us where we need to be." Neither the State nor defense counsel objected.

{¶42} In his brief, Porter argues that defense counsel was "give[n] an opportunity to introduce extrinsic evidence before the jury to show [Detective Ross'] bias" and was ineffective

for failing to take advantage of such opportunity. However, a reading of the transcript reveals that the court declined to permit extrinsic evidence on this issue. Porter does not argue that the court erred in refusing to admit extrinsic evidence. Moreover, Porter's argument does not explain what "extrinsic evidence" should have been admitted. Presumably, Porter is arguing that the observer(s) should have been called to testify. However, that argument necessarily relies on what the observer(s) would have testified to. As this testimony is not a part of the record, it cannot establish ineffective assistance and is more appropriate for a petition for post-conviction relief.

{¶43} Lastly, Porter argues that his counsel was ineffective for failing to correct the testimony of Ms. Tyla Dudley, a social worker from Akron Children's Hospital. Porter called Ms. Dudley to testify about her interview with C.S., and she was given a copy of her report to reference. The following exchange occurred during direct examination.

[Defense:] Okay. Did you ask her any further questions?

[Ms. Dudley:] Yes. I asked about her periods and she talked about being on birth control because that would help regulate it.

On cross-examination, Ms. Dudley re-read her report and confirmed that C.S. was not on birth control and did not say that she was. Defense counsel addressed the issue in his closing argument.

You heard the social worker. I want to talk to you about that, too. I ripped [the report] out. I don't remember seeing it. I had to rip off the report so she could take it and read through them. I didn't have a copy. I didn't know – I said to her why don't you just read verbatim from the report, Ms. Dudley. She didn't. I didn't know what she was saying at the time. If I had my own copy, I would have corrected her and that was [the prosecutor's] job. He did it. He corrected her. It wasn't my purpose to mislead you. * * *

{¶44} Porter argues that his counsel's failure to correct Ms. Dudley's testimony regarding the birth control "cast doubt on [her] credibility." However, Porter fails to explain

how the result of his trial would have been different if his attorney had corrected Ms. Dudley's testimony on direct examination. *See Strickland*, 466 U.S. at 687. As we have repeatedly held, "[i]f an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998).

**{¶45}** Porter's second assignment of error is overruled.

Assignment of Error Number Three

THE COURT SHOULD DECLARE PLAIN ERROR SUA SPONTE TO AVOID
A MISCARRIAGE OF JUSTICE.

**{¶46}** In his third assignment of error, Porter argues that the presentation of Porter's recorded interview in addition to Detective Ross' testimony was cumulative and prejudicial to Porter and amounted to plain error.

**{¶47}** Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To establish plain error:

> First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial rights[ ]" [to the extent that it] * * * affected the outcome of the trial.

(Alterations sic.) *State v. Hardges*, 9th Dist. Summit No. 24175, 2008-Ohio-5567, ¶ 9, quoting S*tate v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Courts are to notice plain error 'only to prevent a manifest miscarriage of justice.'" *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 16, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶48} Porter argues that "the double presentation of evidence improperly and unfairly bolster[ed] Detective Ross's testimony when his credibility had yet to have been placed in question." However, Porter offers no specific argument about how Detective Ross' testimony was bolstered by the presentation of the taped interview. Further, Porter makes no argument that the outcome of the trial would have been different without the presentation of the recording. Assuming arguendo that the court erred in admitting the video, Porter has not established prejudice. Therefore, we cannot find plain error. Porter's third assignment of error is overruled.

## III

{¶49} Porter's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

        BETH WHITMORE
        FOR THE COURT


MOORE, P. J.
BELFANCE, J.
CONCUR.


APPEARANCES:

ROBERT C. MEEKER, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.