[Cite as *In re B.J.*, 2021-Ohio-3926.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE B.J.

A Minor Child

:

:

:

No. 110223

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART,
AND REMANDED
**RELEASED AND JOURNALIZED:** November 4, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-19-115037

*Appearances:*

Rachel A. Kopec, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Alicia Harrison, Assistant Prosecuting
Attorney, *for appellee.*

MARY J. BOYLE, A.J.:

{¶ 1} Defendant-appellant, B.J., appeals the juvenile court's adjudications

of delinquency and disposition. He raises five assignments of error for our review:

1. The record does not support the Journal Entry dated December 18,
2020.

2. The court abused its discretion by sustaining an objection based on
propensity of the evidence.

3. The Trial Court erred as a matter of law in finding the Appellant delinquent when there was not sufficient evidence to support the convictions.

4. The manifest weight of the evidence did not support the convictions.

5. Any convictions should merge for the purposes of sentencing as allied offenses of similar import.[1]

{¶ 2} Finding merit to the fifth assignment of error, we vacate the juvenile court's disposition order and remand for resentencing.

## I. Procedural History and Factual Background

{¶ 3} In December 2019, B.J. was charged in juvenile court with five counts: Count 1, rape in violation of R.C. 2907.02(A)(2), a first-degree felony, by engaging in vaginal intercourse with Jane Doe by force or threat of force; Count 2, rape in violation of R.C. 2907.02(A)(1)(c), a first-degree felony, by engaging in vaginal intercourse with Jane Doe knowing that her ability to resist or consent was substantially impaired; Count 3, rape in violation of R.C. 2907.02(A)(2), a first-degree felony, by engaging in cunnilingus with D.C. by force or threat of force; Count 4, rape in violation of R.C. 2907.02(A)(1)(c), a first-degree felony, by engaging in cunnilingus with Jane Doe knowing that her ability to resist or consent was substantially impaired; and Count 5, attempted rape in violation of "R.C. 2923.02/2907.02(A)(2)," a second-degree felony, by attempting to engage in vaginal intercourse with Jane Doe by force or threat of force.

---

[1] B.J. raised the first four assignments of error in his appellate brief, and he raised the fifth assignment of error in response to this court's sua sponte order for supplemental briefing, as discussed more fully below.

{¶ 4} A bench trial was held in December 2020. The parties stipulated to the authenticity of a DNA report and that B.J.'s date of birth was November 12, 2001, showing that he was 17 years old at the time of the alleged offenses. During opening statements, the state clarified that the Jane Does in the indictment refer to the same victim, D.C., and defense counsel stated that "this is a consent case." The state presented three witnesses: D.C., Detective John Finucan, and a SANE nurse.

{¶ 5} D.C. testified that in August 2019, she reserved two rooms in a hotel in Beachwood to celebrate her 20th birthday and the birthday of her friend, Duane. She explained that she reserved a room for herself for three nights and a room for Duane for two nights. She said that they hosted parties in Duane's room, and she slept in her room. She stated that as she was getting ready for the party on the second night, Duane came into her room and asked if his friend Kyrie could bring his friend Buddy to the party that night.[2] D.C. testified that she did not know Buddy and had never met him, but it was a celebration, and she "didn't really care" if Kyrie brought Buddy. She said she later learned that Buddy's name was B.J., and she identified B.J. in the courtroom.

{¶ 6} D.C. explained that when she had finished getting ready for the party, she went to Duane's room. B.J. was already there, and he was asleep. A group of D.C.'s and Duane's friends were also in Duane's room, and they started drinking alcohol and socializing. She said that eventually B.J. woke up and joined in the

---

[2] D.C. initially referred to Kyrie as "Khalil" and said she wasn't sure "Khalil" was his name. On cross-examination, defense counsel asked if his name was "Kyrie," and D.C. said that Kyrie was the correct name, not Khalil.

conversation. She explained that she and B.J. had a "regular conversation" about her children and interests, "just normal get-to-know-you questions the first time you meet somebody." D.C. stated that she was not looking for a relationship, she did not feel interested in B.J., and she was treating him as a new friend. She described the conversation as "very innocent, very just get to know you." She said, "there was really no real, like, flirting back and forth." She explained that B.J. told her she was pretty a few times, but she pretended like she did not hear the compliment because she did "not like turning people down like that."

{¶ 7} D.C. testified that she drank a lot of alcohol throughout the night, and around midnight, she realized that she was losing her balance. She knew that she was drunk and that it was time for her to leave. D.C. told Duane she was leaving, and B.J. offered to walk her to her room so they could "finish chatting." D.C. said she "didn't mind" but made it clear that she was going to sleep. She stated that when they got to the door of her room, she went inside her room and told B.J. that she was going to sleep. She said he "insisted" on finishing their conversation and "pushed" the door so he could come in. She clarified that he did not push the door "aggressively." D.C. testified that she said, "okay, but I'm getting ready to go to sleep."

{¶ 8} D.C. testified that she let B.J. in her room, changed into her pajamas in the bathroom, and got into bed. At some point, Duane knocked on her door and asked if everything was okay, and she responded that everything was fine. She testified that B.J. stood on the opposite side of the room from her bed and continued

talking. She said she tried to listen to what he was saying, but it sounded like mumbling to her because she was falling asleep. D.C. explained that as she was falling in and out of sleep, B.J. kept talking and "getting closer to the bed" until he was standing right next to her bed. She said that she apologized to him for "falling asleep in the middle of a conversation," but that she was tired. She testified that she did not explicitly tell him to leave because she was "in and out of sleep," but she thought it was "common sense" that she wanted him to leave. She said she fell back to sleep.

{¶ 9} D.C. testified that the next time she woke up, B.J. was in bed with her and was "yanking" her leg. She said that he removed her underwear. She explained that B.J. "started getting closer" to her, and she tried to push him away with both of her arms and "kept moving" to try to get him away. She testified that B.J. was not talking anymore and was "straight action." She said he pulled her closer and tried to force her to perform oral sex. D.C. stated that she pulled her head back with as much force as she could. She said that B.J. then changed positions and penetrated her vaginally, holding her waist down. D.C. testified that she tried to "scoot" away from him. She said she told him "no" multiple times and "stop" at least once. She said that B.J. then "turned" her around and tried to penetrate her vaginally in a different position. She said he had his thumb on her back holding her down. As she was describing the encounter, D.C. stopped to apologize to the court. She explained that she "chuckle[s]" when she is nervous and that she was "really nervous."

{¶ 10} D.C. explained that at one point she was "hanging off of the bed" and tried to "grab" hold of the nightstand next to the bed to "try[] to get out of there." The state submitted as exhibits photos of the hotel room. D.C. pointed out that the photo showed that the drawer of the nightstand was slightly opened. She explained that she had been grabbing at the drawer of the nightstand. She said she was crying and "kept saying no." She explained she was scared, "literally balling [her] eyes out," and did not know how to get out of the situation. She explained she felt "stuck" and eventually went "still" to "get it over with." She said that B.J. eventually got off of her, and she "passed out." She clarified that she was still drunk, and she "went straight back to sleep."

{¶ 11} D.C. stated that when she woke up, B.J. was "still there." He was asleep. She said she "felt disgusted" and took a shower. She then got dressed and went "straight to Duane's room." She said Duane did not answer the door, so she went back and forth between his room and the hotel cafe a few times to try to find him. She stated that she kept knocking on Duane's door, and he eventually answered, half asleep. She testified that she kept repeating that he needed to get B.J. out of her room. She said Duane was confused, and he took her to the cafe for her to explain what was going on because she looked "scared." D.C. testified that Kyrie was at the cafe, and she told both Kyrie and Duane that B.J. "forced himself on [her,]" that she "didn't want it to happen," and she did not know "what the heck just happened last night." She urged them to get B.J. out of her room, but they did not.

{¶ 12} D.C. testified that Duane wanted more details, so they left the cafe and went into the hotel hot tub to talk about what happened. Eventually, B.J. came outside and approached them in the hot tub. D.C. said she told Duane it was time to check out of the hotel and leave. She said Duane asked her if there was anything she needed, and she responded she was going to leave the hotel with Duane, Kyrie, and B.J. because she wanted to learn where Kyrie and B.J. were staying. She explained that B.J. was a stranger, and she wanted "some type of information" that she could give to the police or a friend. She testified that the four of them got into Duane's car together and drove "in silence" until Duane dropped off Kyrie and B.J. at Kyrie's apartment.

{¶ 13} D.C. said that Duane eventually dropped her off back at the hotel because she still had her room reservation for one more night. D.C. testified that from her hotel room, she called her daughter's father, whom she described as her best friend, and he told D.C. that she should call the police. She said she called the police, and they came to her hotel room. She stated that an ambulance then took her to the hospital, where a rape kit was performed. D.C. explained that her mom met her at the hospital, and when D.C. had completed the rape kit and spoken with a detective, she and her mom went back to the hotel. D.C. explained that sometime later, police had her complete a photo lineup, and she immediately recognized B.J.'s photo. The state submitted the photo lineup as an exhibit.

{¶ 14} On cross-examination, D.C. agreed that she had a conversation with B.J. on the phone sometime "way before" the party. She explained that she had been on a phone call with Duane, and B.J. was physically present with Duane at the time.

{¶ 15} Defense counsel asked D.C. if she remembered telling a detective that B.J. had been flirting with her during the party. D.C. responded that she recognized that B.J. was trying to flirt with her but that she was not interested. She also agreed that at the time of the party, she was still interested in reconnecting with her daughter's father. She agreed that she did not try to scream, scratch, slap, or poke B.J. in the eyes. She also agreed that she told a detective that B.J. overpowered her but "never held [her] down."

{¶ 16} Next, the state called Detective Finucan, who testified via Zoom. Detective Finucan, a Beachwood police officer, testified that on September 1, 2019, around 3:00 p.m., he responded to D.C.'s report of sexual assault at the hotel. He stated that he collected evidence and took photographs of the hotel room, and then he interviewed D.C. at the hospital. He testified that D.C. told him that she had been partying with friends in a hotel room, drinking and smoking marijuana, and one of the males, B.J., followed her back to her room at the end of the night. Detective Finucan said that D.C. told him that B.J. wanted to talk more, and she allowed him to come into her room. D.C. told Detective Finucan that she got into bed, B.J. eventually came to sit on the bed, and she told B.J. he had to sleep either on the pullout couch or on the other side of the bed. Detective Finucan testified that D.C. said she then fell asleep, and when she woke up, B.J. was removing her underwear,

and then he raped her.  Detective Finucan said that D.C. knew B.J. only as "Buddy," and she provided a physical description of him and his clothing.

{¶ 17} Detective Finucan testified that after he interviewed D.C., a SANE nurse performed a sexual assault kit, and he took the kit back to the police station and placed it into evidence. Detective Finucan obtained buccal swabs from B.J., and B.J.'s DNA matched the DNA found in the kit.  Detective Finucan then had a photo lineup administered to D.C., and she identified B.J. from the lineup.

{¶ 18} The state's final witness, a SANE nurse at the Cleveland Clinic, testified that she examined D.C. on September 1, 2019, and completed D.C.'s rape kit.  She testified that D.C. did not keep eye contact with her.  She said D.C. looked downward and cried several times during their conversation.  She explained that this behavior was common with other patients she has seen who had experienced recent trauma.  The SANE nurse testified she found no physical injuries, and D.C. reported that she was not in physical pain.  The SANE nurse noted that any potential bruising D.C. may have suffered would not have appeared yet, and a lack of physical injury "does not mean nothing happened."  She also testified that she found D.C. to be credible.  The state submitted D.C.'s medical report as an exhibit.

{¶ 19} The court admitted the DNA report, the medical report, the photo lineup, and the hotel room photographs into evidence.  The defense rested without presenting witnesses.

{¶ 20} After closing arguments, the court found B.J. delinquent of Counts 1, 2, and 5: two counts of rape and one count of attempted rape based on vaginal

intercourse. The court found B.J. not delinquent of Counts 3 and 4: rape based on cunnilingus. The journal entry of delinquency and unruly states, "Upon due consideration, the court finds that the allegations of the complaint have been proven beyond a reasonable doubt. The court therefore finds that the child is delinquent." The entry further states that the court adjudicated B.J. delinquent on Counts 1, 2, and 5.

{¶ 21} The court held a disposition hearing the next day. For each count, the court imposed a minimum term of one year and a maximum term until he turns 21 to the Ohio Department of Youth Services ("ODYS"). The court ordered the terms for Counts 1 and 5 to run concurrently, and the term for Count 2 to run consecutively to the term for Count 1. The cumulative disposition was therefore a minimum of two years in ODYS and a maximum of until he turns 21. The court also ordered that B.J. complete a psychological evaluation and a sexual offender's assessment at ODYS. The court waived costs.

{¶ 22} B.J. timely appealed.

{¶ 23} After the parties submitted appellate briefs, this court sua sponte remanded the cases to the juvenile court to issue a nunc pro tunc entry (1) reflecting a disposition on Counts 3 and 4, and (2) correcting a typo on the sentencing entry that "purports to impose a commitment on [C]ount three when the transcript reflects that the court imposed the commitment on [C]ount five." The court issued a nunc pro tunc entry correcting the typo and finding B.J. not delinquent on Counts 3 and 4. This court again remanded the case to the juvenile court to issue another

nunc pro tunc entry that included in a single document the fact of conviction and disposition for each count, the judge's signature, and the clerk's file stamp. The juvenile court issued a nunc pro tunc entry that complied with this order.

{¶ 24} After oral argument, we sua sponte ordered the parties to submit supplemental briefs regarding whether any of B.J.'s adjudications should merge for sentencing purposes. In his supplemental brief, B.J. asserted as a fifth assignment of error that all of his adjudications should have merged for sentencing.

## II.  Nunc Pro Tunc Entry

{¶ 25} In his first assignment of error, B.J. argues that the record does not support the juvenile court's December 18, 2020 entry. He points out that the entry states that "the allegations of the complaint have been proven beyond a reasonable doubt," but the trial transcript shows that the court found B.J. delinquent only on Counts 1, 2, and 5, not the entire complaint. He requests that we remand the matter to the juvenile court for a nunc pro tunc order.

{¶ 26} After B.J. filed his appellate brief, this court remanded the case to the juvenile court for this reason, and the juvenile court issued a nunc pro tunc entry finding B.J. not delinquent on Counts 3 and 4.

{¶ 27} Accordingly, we overrule this assignment of error as moot.

## III.  Objection Regarding Substance of Phone Call

{¶ 28} In his second assignment of error, B.J. argues that the juvenile court erred when it sustained the state's objection to a question about the substance of a prior phone call between D.C. and B.J. He maintains that the question was meant

to challenge D.C.'s truthfulness based on her previous testimony that she had never interacted with B.J. before the night of the party. He contends that a defendant is "always allowed to question the truthfulness of a witness."

**{¶ 29}** "An appellate court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion." *Taylor-Stephens v. Rite Aid of Ohio*, 8th Dist. Cuyahoga No. 106324, 2018-Ohio-4714, ¶ 24. An abuse of discretion occurs when the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Marketing Assocs. v. Gottlieb*, 8th Dist. Cuyahoga No. 92292, 2010-Ohio-59, ¶ 47.

**{¶ 30}** B.J.'s argument is based on the following exchange that occurred at trial:

| | |
|---|---|
| DEFENSE COUNSEL: | Now, you told us earlier that the second night when you first encountered [B.J.] that was the first time you had ever met him, right? |
| D.C.: | Mm-hmm. |
| DEFENSE COUNSEL: | And I think you told us that you never talked to him before, but there was a phone call, right? You talked to him on the phone not too long before the party, right? |
| D.C.: | Way before that. |
| DEFENSE COUNSEL: | Oh. It was way before. Do you remember when it was? |
| D.C.: | No. It was just a random conversation [when he was] with Duane and he spoke, but I didn't know who he was. I just was like, oh, okay, da-da-da. He sounded familiar when I saw him on the — |
| DEFENSE COUNSEL: | Okay. But there was — would you agree with me that the conversation, the brief |

|                   | conversation that you had on the phone, whatever that was, was sort of sexual in nature? |
|---|---|
| PROSECUTOR: | Objection. |
| D.C.: | No. Well, not between me and him, no. |
| DEFENSE COUNSEL: | Hold on. |
| PROSECUTOR: | Objection, your Honor. |

{¶ 31} The prosecutor argued that the line of questioning was "improper character evidence and protected under rape shield." Defense counsel argued that the rape shield law did not apply because he was asking about "a conversation" rather than any sexual acts and because the rape shield law does not apply to "anything that might have occurred between an alleged victim and a defendant." The prosecutor maintained that the question sought inappropriate "propensity evidence." The court sustained the objection.

{¶ 32} Evid.R. 404(A) provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, subject to" certain exceptions. One exception is that "[e]vidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607, 608, and 609." Pursuant to Evid.R. 607(B), counsel "must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact."

{¶ 33} Here, the question into the substance of the phone call does not pertain to the existence of an impeaching fact. D.C. testified on direct examination

that she had never "met" B.J. before the party. On cross-examination, D.C. explained that sometime "way before" the party, she had a phone call with Duane, and B.J. had happened to be physically present with Duane. These two statements do not conflict. Even if D.C. had testified on direct examination that she had never "spoken with" B.J. before the night of the party, defense counsel solicited the "impeaching fact" when he asked if D.C. had spoken to B.J. on the phone before the party, and D.C. responded that she had. The substance of their conversation was unnecessary for impeachment.

{¶ 34} Accordingly, we find that the court's decision to sustain the prosecutor's objection was not "unreasonable, arbitrary, or unconscionable," and the trial court did not abuse its discretion. Therefore, we overrule B.J.'s second assignment of error.

## IV. Sufficiency and Manifest Weight of the Evidence

{¶ 35} In his third assignment of error, B.J. argues that the record does not contain sufficient evidence to support his adjudications of delinquency. In his fourth assignment of error, he contends that his adjudications were against the manifest weight of the evidence. In both assignments of error, he maintains that D.C. provided inconsistent testimony. He also argues that the trial court's findings that he is delinquent for two counts of rape and one count of attempted rape based on vaginal intercourse conflict with its findings that he is not delinquent for the two counts of rape based on oral sex. The state maintains that D.C.'s testimony and the

trial court's findings were consistent. We will address both assignments of error together for ease of discussion.

{¶ 36} When we review sufficiency and manifest-weight challenges in a juvenile's appeal from an adjudication of delinquency, we apply the same standard as in criminal convictions. *In re M.P.*, 8th Dist. Cuyahoga No. 93152, 2010-Ohio-2216, ¶ 22.

{¶ 37} Crim.R. 29(A) provides for an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." A sufficiency challenge essentially argues that the evidence presented was inadequate to support the judgment as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 38} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins* at 387. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.* "In a bench trial, the trial court assumes the fact-finding function of the jury." *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125, ¶ 16 (8th Dist.). Therefore, "to warrant

reversal from a bench trial under a manifest weight of the evidence claim," we "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.*, citing *Thompkins* at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 39} B.J. challenges his adjudication for Count 1, rape by force or threat of force in violation of R.C. 2907.02(A)(2). R.C. 2907.02(A)(2) states: "No person shall engage in sexual conduct with another when the offender purposefully compels the other person to submit by force or threat of force." "Force" means "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A). "The manipulation of a sleeping victim's clothing in order to facilitate sexual conduct constitutes force." *State v. Clark*, 8th Dist. Cuyahoga No. 90148, 2008-Ohio-3358, ¶ 17.

{¶ 40} After reviewing the record in the light most favorable to the state, we find there was sufficient evidence for the court to find B.J. delinquent of rape under R.C. 2907.02(A)(2). D.C. testified that she woke up to B.J. "yanking" on her leg and removing her underwear. She said that he penetrated her vaginally while she said "no" and "stop" and that she "kept moving" and "scoot[ing]" away. D.C. testified

that B.J. then repositioned her to again penetrate her vaginally. She stated that he held her waist down. D.C.'s testimony is sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that B.J. engaged in sexual conduct with her by purposefully compelling her through force.

{¶ 41} B.J. also challenges his adjudication for Count 2, rape knowing D.C.'s ability to resist or consent was substantially impaired in violation of R.C. 2907.02(A)(1)(c). R.C. 2907.02(A)(1)(c) states: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age." "[S]leep constitutes a mental or physical condition that substantially impairs a person from resisting or consenting to sexual conduct." *State v. Palmer-Tesema*, 8th Dist. Cuyahoga No. 107972, 2020-Ohio-907, ¶ 60. "Voluntary intoxication" is also "a mental or physical condition that could cause substantial impairment," and a victim's testimony can be sufficient to show substantial impairment. *State v. Foster*, 2020-Ohio-1379, 153 N.E.3d 728, ¶ 42-45 (8th Dist.).

{¶ 42} After reviewing the record in the light most favorable to the state, we find there was sufficient evidence for the court to find B.J. delinquent of rape under R.C. 2907.02(A)(1)(c) beyond a reasonable doubt. D.C. testified that she had been drinking alcohol at a party with B.J., had lost her balance, and was intoxicated when

she allowed B.J. to come into her hotel room. B.J. was with D.C. as she consumed alcohol and would have reasonably known that she was intoxicated. D.C. also told B.J. that she needed to go to sleep. She testified that she was falling in and out of sleep as B.J. was talking to her and walking toward her bed. D.C. testified that after she fell asleep, she woke up to B.J. "yanking" at her leg. The testimony regarding her intoxication and falling asleep is sufficient evidence of substantial impairment.

{¶ 43} Lastly, B.J. challenges his adjudication for Count 5, attempted rape by force or threat of force in violation of R.C. 2923.02(A) and 2907.02(A)(2). R.C. 2923.02(A) provides that a person is guilty of an attempt to commit a crime if he "purposely or knowingly * * * engages in conduct that, if successful, would constitute or result in the offense." A criminal attempt has been committed "'when one purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his [or her] commission of the crime.'" *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio 7247, 781 N.E.2d 980, ¶ 95, quoting *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), paragraph one of the syllabus.

{¶ 44} After reviewing the record in the light most favorable to the state, we find there was sufficient evidence for the court to find B.J. delinquent of attempted rape by force or threat of force beyond a reasonable doubt. D.C. testified that after B.J. penetrated her the first time, she pushed against him to get away. She said he then had to reposition her to penetrate her again while holding her down. D.C.'s testimony is sufficient to support an adjudication for attempted rape through force.

{¶ 45} B.J. argues that the court's findings that he is delinquent of Counts 1, 2, and 5 were inconsistent with the findings that he is not delinquent of Counts 3 and 4. We disagree. Counts 1, 2, and 5 were charges based on vaginal intercourse, but Counts 3 and 4 were based on oral sex. There was no testimony in the record that B.J. had engaged in oral sex with D.C., but there was testimony that he had engaged in vaginal intercourse.

{¶ 46} B.J. also maintains that D.C.'s trial testimony differed from what she told Detective Finucan and the SANE nurse. B.J. points out that D.C. did not tell Detective Finucan that B.J. had held her down, and D.C. reported no injuries or pain to the SANE nurse. He further argues that during her direct examination, D.C. failed to mention that the morning after the incident, she let B.J. return to her hotel room and that she had a phone call with B.J. sometime before the party. These arguments pertain to D.C.'s credibility and the weight of the evidence.

{¶ 47} As previously discussed, D.C.'s statement that she had never met B.J. before the party was consistent with the rest of her testimony. D.C. also said she did not remember telling a detective that B.J. returned to her room the next morning as she was getting ready to check out of the hotel. Detective Finucan likewise said he did not remember whether D.C. told him that. Even if D.C. told the detective that B.J. returned to her room, we find that her failure to remember this does not ruin her credibility. Over a year had passed between the event and trial. Additionally, as the SANE nurse explained, a lack of physical injury is not dispositive in a rape case.

{¶ 48} B.J. also presents possible ulterior motives for D.C.'s rape allegations. He argues that the record shows that D.C. wanted to get back together with her daughter's father, and he maintains that having consensual relations with B.J. would not "help rekindle" that relationship. He also argues that D.C. was recently hired as a teacher's aide in a middle school, and consensual sexual activity with a minor would risk her career. However, D.C. was hired in a school after the events underlying this case. And we find that the evidence of the relationship between D.C. and her daughter's father do not outweigh all the other evidence supporting the delinquency adjudications.

{¶ 49} Viewing the evidence in the light most favorable to the prosecution, we find that the state presented sufficient evidence to support B.J.'s adjudications of delinquency for two counts of rape and one count of attempted rape beyond a reasonable doubt. Furthermore, after reviewing the entire record and weighing the evidence and all reasonable inferences, we find that the court did not clearly lose its way and create such a manifest miscarriage of justice that B.J.'s adjudications must be reversed and a new trial ordered. This is simply not the exceptional case where the evidence weighs heavily against the adjudication. Accordingly, we overrule B.J.'s third and fourth assignments of error.

## V.   Allied Offenses

{¶ 50} In his final assignment of error, B.J. argues that if we affirm his adjudications, they should all merge for the purpose of sentencing because they are

allied offenses of similar import.  He maintains that the trial court erred by imposing a disposition for each count.

{¶ 51} The state concedes that "[a]ll delinquent counts occurred in one course of conduct on the same night.  Thus, all offenses [B.J.] was found delinquent of merge for sentencing."  Accordingly, we sustain B.J.'s final assignment of error.

{¶ 52} We affirm B.J.'s adjudications, but we vacate his disposition.  We remand the matter to the juvenile court for a disposition hearing and for the state to elect which allied offense to pursue.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, ADMINISTRATIVE JUDGE

MICHELLE J. SHEEHAN, J., and
EILEEN T. GALLAGHER, J., CONCUR