[Cite as *State v. Simmons*, 2024-Ohio-3036.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29941 |
| | : | |
| v. | : | Trial Court Case No. 2023 CR 01273 |
| | : | |
| MARQUECE ALLEN SIMMONS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 9, 2024

. . . . . . . . . . .

STEPHEN P. HARDWICK, Attorney for Appellant

NATHAN B. VANDERHORST by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant Marquece Allen Simmons appeals from his conviction for forcible rape following a jury trial in the Montgomery County Court of Common Pleas. The jury found Simmons guilty of forcible rape, aggravated burglary, and sexual battery, all of

which were merged at sentencing into a single conviction for forcible rape. On appeal, Simmons contends that his conviction for forcible rape should be vacated because it was not supported by sufficient evidence and because the trial court gave an erroneous jury instruction on the element of force. Simmons also claims that his conviction should be reversed because the trial court improperly excluded certain lay witness opinion testimony at trial. For the reasons outlined in this opinion, we find that Simmons's conviction for forcible rape was not supported by sufficient evidence. Accordingly, that conviction will be vacated, and the matter will be remanded to the trial court so that the court can: (1) consider whether the vacation of the forcible rape conviction affects the merged aggravated burglary offense for which Simmons was found guilty and, if necessary, whether the guilty verdict for sexual battery supports a lesser-included offense of aggravated burglary; and (2) sentence Simmons for the offenses that merged into his forcible rape conviction.

### Facts and Course of Proceedings

{¶ 2} On May 8, 2023, a Montgomery County grand jury indicted Simmons on one count each of forcible rape in violation of R.C. 2907.02(A)(2), aggravated burglary in violation of R.C. 2911.11(A)(1), and sexual battery in violation of R.C. 2907.03(A)(3). The charges stemmed from allegations that Simmons had trespassed inside a Dayton residence during the early morning hours of April 15, 2023, and inserted his fingers inside a female resident's vagina while she was sleeping on her living room couch. Simmons pled not guilty to the charges and the matter proceeded to a jury trial. At trial, the State

presented testimony from multiple witnesses, including the victim, M.H. The following information was elicited from the testimony and exhibits presented at trial.

{¶ 3} In the spring of 2023, 21-year-old M.H. was a college student who lived with four female roommates in a two-story house in the city of Dayton, Montgomery County, Ohio. On the night of April 14, 2023, M.H. went to a nearby house party, where she drank alcohol and hung out with friends. M.H. drank five or six mixed vodka drinks between 9:00 p.m. and 1:00 a.m. the next morning. M.H. left the house party around 3:30 a.m. and walked back to her residence.

{¶ 4} M.H. had initially planned to stay up all night because she and her friends were going to a local bar at 5:30 a.m. for a special gathering. However, after returning from the house party, M.H. changed her mind and decided to take a short nap on her living room couch. The living room couch was located on the first floor of M.H.'s residence near the residence's front door. Before lying down, M.H. briefly spoke to two of her roommates and one of her roommate's boyfriends as they were making their way upstairs to go to sleep. During that time, no one locked the front door to the residence.

{¶ 5} M.H. fell asleep on the living room couch wearing a white tennis skirt, underwear, a crop top, a sweatshirt, and shoes. M.H. slept with a crocheted blanket and had "one leg curled up and…one leg straight." Trial Tr. p. 211. While she was sleeping, M.H. had a weird feeling that someone was touching her. She then suddenly awoke to find a man she did not know sitting beside her on the couch with his fingers inside her vagina. M.H. jolted up and immediately asked the man who he was and why he was at her residence. In response, the man repeatedly said his name was "Dimitri." Trial Tr.

p. 170. The man paced around the house for approximately one minute while M.H. frantically shouted for him to leave. Shortly thereafter, the man said, "my name is Dimitri and I'm out" and then left the house through the front door. *Id.* at 171.

{¶ 6} After the man left, M.H. wanted to leave her residence because she felt unsafe and did not want to wake up her roommates. Accordingly, M.H. left her residence to meet with some friends who were awake at a nearby house. When M.H. spoke with her friends, they convinced her to call the police and report what had happened to her. Three Dayton police officers met M.H. at the local bar where she was attending the 5:30 a.m. gathering. The officers spoke with M.H. outside the bar and took a statement from her. Thereafter, one of the officers transported M.H. home. M.H. declined to be transported to the hospital for a sexual assault examination, and the officers did not ask M.H. to submit any of her clothing for DNA testing.

{¶ 7} At M.H.'s residence, one of the investigating officers obtained video footage from a Ring camera that had been installed on M.H.'s front door. The Ring camera video was played for the jury and admitted into evidence as State's Exhibit 1. The time-stamp on the video established that the camera began recording at 4:43 a.m. on April 15, 2023. The video showed a man walking up to the front door of M.H.'s residence while holding a cellphone and a red DoorDash bag. The man paused for a moment and looked through the glass storm door before opening the door and entering the residence. The video footage also showed the man quickly leaving the residence at 4:52 a.m. and driving off in a white sedan. The man's face was clearly visible on the video.

{¶ 8} The investigating officers used still shot images from the Ring camera video

and other law enforcement tools to identify the man as Simmons. A detective thereafter interviewed Simmons on April 27, 2023. The interview was video-recorded and admitted into evidence as State's Exhibit 4. During the interview, Simmons identified himself as the person shown in the images from the Ring camera video. Simmons also admitted to having been inside M.H.'s house. Simmons first told the detective that he had gone to M.H.'s house to fulfill a DoorDash order. However, Simmons later changed his story and claimed that he went to the house to sell marijuana to someone named Zachary. The investigating detective subpoenaed DoorDash and confirmed that no order had been placed to M.H.'s residence on the morning in question. The detective also confirmed with the residents of the home that no one named Zachary was associated with the residence.

{¶ 9} After considering the aforementioned testimony and exhibits, the jury found Simmons guilty of all three counts charged in the indictment. The trial court found that all the counts were allied offenses that merged into one offense for sentencing. Following the merger, the State elected to have Simmons sentenced for forcible rape in violation of R.C. 2907.02(A)(2). The trial court imposed a mandatory, indefinite sentence of a minimum of four years to a maximum of six years in prison and designated Simmons a Tier III sex offender.

{¶ 10} Simmons now appeals from his conviction, raising three assignments of error for review.

**First Assignment of Error**

**{¶ 11}** Under his first assignment of error, Simmons contends that the State failed to present sufficient evidence to support his conviction for forcible rape in violation of R.C. 2907.02(A)(2).   We agree.

**{¶ 12}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."   *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997).   "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt."   (Citations omitted.)   *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).   "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact."   (Citations omitted.)   *Id.*

**{¶ 13}** An offender commits rape in violation of R.C. 2907.02(A)(2) when he or she "engage[s] in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."   R.C. 2907.02(A)(2).   "Sexual conduct" includes "the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another."   R.C. 2907.01(A). "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit."   *State v. Schaim*, 65 Ohio St.3d 51 (1992), paragraph one of the syllabus.

{¶ 14} The term "force" is statutorily defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). The words "violence," "compulsion," and "constraint" are not defined by statute; therefore, we give them their "plain and ordinary meaning." *State ex rel. Mobley v. Franklin Cty. Bd. of Commrs.*, 2023-Ohio-3993, ¶ 10, citing *Brecksville v. Cook*, 75 Ohio St.3d 53, 56 (1996). This court has recognized that "[t]he word 'compulsion' is usually applied to a power or agency that compels, usually making an individual follow a will not his own[,]" and that " '[c]onstraint' usually applies to an agency causing unwilling performance or avoidance of action." *State v. Gregg*, 1992 WL 302438, *3 (2d Dist. Oct. 26, 1992). Black's Law Dictionary defines "violence" as: "The use of physical force, usu. accompanied by fury, vehemence, or outrage; esp., physical force unlawfully exercised with the intent to harm." *Black's Law Dictionary* (11th ed. 2019).

{¶ 15} The use of the word "any" in the definition of "force" "recognizes that different degrees and manners of force are used in various crimes with various victims." *State v. Haynes*, 2020-Ohio-6977, ¶ 31 (6th Dist.) *rev'd on other grounds*, 2022-Ohio-4473. "In order to make a finding of force under R.C. 2907.02, 'some amount of force must be proven beyond that force inherent in the crime itself.' " *State v. Zimpfer,* 2014-Ohio-4401, ¶ 46 (2d Dist.), quoting *State v. Dye*, 82 Ohio St.3d 323, 327 (1998). The Supreme Court of Ohio has explained that: "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge*, 38 Ohio St.3d 56 (1988), paragraph one of the syllabus. *Accord State v. Hartman,* 2016-Ohio-2883, ¶ 28 (2d Dist.). " 'Force need not

be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.' " *Eskridge* at 58-59, quoting *State v. Fowler*, 27 Ohio App.3d 149, 154, (8th Dist. 1985), citing *State v. Martin*, 77 Ohio App. 553 (9th Dist. 1946). (Other citation omitted.) *Accord Hartman* at ¶ 28.

{¶ 16} The Eighth District Court of Appeals has long held that, where a victim is sleeping at the outset of sexual conduct and thus not aware of the defendant's intentions, the force element of rape is established with the minimal force required to manipulate the victim's clothing in order to facilitate the sexual conduct. *State v. Clark*, 2008-Ohio-3358, ¶ 16-19 (8th Dist.); *State v. Clarke*, 2010-Ohio-5010, ¶ 23 (8th Dist.); *State v. Walker*, 2011-Ohio-6645, ¶ 20 (8th Dist.); *In re B.J.*, 2021-Ohio-3926, ¶ 39 (8th Dist.); *State v. Graves*, 2007-Ohio-5430, ¶ 17-18 (8th Dist.) ("separating the victim's legs and pulling down the victim's clothing while the victim sleeps can only be accomplished through force"). The Eighth District has even inferred the use of minimal force to facilitate sexual conduct with a sleeping person when there was no evidence that the defendant removed or manipulated the rape victim's clothing. *See State v. Fortson*, 2010-Ohio-2337, ¶ 75 (8th Dist.) ("Although there was no evidence . . . that defendant removed or manipulated the rape victim's clothing while she was sleeping, we find that a rational trier of fact could have inferred that defendant must have used minimal force to facilitate sexual conduct with a sleeping [person].").

{¶ 17} The State relies on the foregoing Eighth District case law to argue that it presented sufficient evidence of Simmons's use of force to compel M.H. to submit to the

sexual conduct at issue. According to the State, a rational factfinder could have concluded that the force element of rape was satisfied because the evidence established that Simmons would have had to manipulate M.H.'s blanket and clothing in order to digitally penetrate her vagina.

{¶ 18} Simmons, on the other hand, directs our attention to *State v. Wine*, 2012-Ohio-2837 (3d Dist.), a case in which the Third District Court of Appeals declined to follow the aforementioned Eighth District case law. *Id.* at ¶ 48-50 (3d Dist.). Although *Wine* concerns a conviction for gross sexual imposition in violation of R.C. 2907.05(A)(1), it is nevertheless relevant because it analyzes the same element of force required for rape in violation of R.C. 2907.02(A)(2), i.e., that the offender purposely compels the other person to submit to sexual contact/conduct by force or threat of force.

{¶ 19} When discussing the element of force, *Wine* explained that there must be "a causal connection between the victim's submission and the element of force since the victim submits '*by* force or threat of force.'" *Wine* at ¶ 40. According to *Wine*, submitting to sexual conduct by force or threat of force requires more than force necessary to facilitate the act, but force or threat of force sufficient to *overcome the will of the victim*. *Id.* at ¶ 49, citing *Eskridge*, 38 Ohio St.3d at 58-59. Therefore, *Wine* found that "the key inquiry for determining whether the State presented sufficient evidence on the element of force is whether the 'victim's will was overcome by fear or duress.'" *Wine* at ¶ 40, quoting *In re N.F.*, 2010-Ohio-2826, ¶ 40 (3d Dist.). (Other citations omitted.)

{¶ 20} *Wine* found that "the Eighth District's interpretation of the element of force in sleeping-victim cases 'fails to recognize the requirement that the force or threat of force

must be sufficient to overcome the will of the victim,' " and therefore "blurs the distinction between sex offenses requiring force and sex offenses not requiring force." *Id.* at ¶ 50, quoting *State v. Henry*, 2009-Ohio-3535, ¶ 32 (3d Dist.). For example, rape in violation of R.C. 2907.02(A)(1)(c) does not require any force, as that statute prohibits engaging in sexual conduct with a person whose "ability to resist is substantially impaired because of a mental or physical condition or because of advanced age[.]" *Wine* found that "diminishing [the] element of force to mere manipulation of a sleeping victim's body or clothing . . . usurps the General Assembly's power to define and codify criminal offenses and to treat offenders differently depending upon the nature of their conduct." *Id.*

{¶ 21} *Wine* also rejected the Eighth District's sleeping-victim case law on grounds that it was derived from the Supreme Court of Ohio's decision in *Eskridge*, 38 Ohio St.3d 56. *Id.* at ¶ 49 (3d Dist.). In *Eskridge*, the Supreme Court held that the force element of rape was satisfied where the evidence established that a father had laid his four-year-old daughter on a bed, removed her underwear, kissed her on the lips and neck, and sexually abused her by putting his penis in her vagina. *Eskridge* at 57-59. In so holding, the Supreme Court "recognize[d] the coercion inherent in parental authority" and found that the existence of such coercion meant that only a minimal degree of force was needed to satisfy the force element of rape when the perpetrator is the parent of the child victim. *Id.* at 58. In other words, the court held that, "[w]ith the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength." *Id.* Therefore, *Eskridge* held that no "explicit threats or displays of force"

were necessary because the father held a position of authority over his daughter. *Id.* at 59. The holding in *Eskridge* was "based solely on the recognition of the amount of control that parents have over their children, particularly young children." *Schaim*, 65 Ohio St.3d at 55. The Supreme Court later recognized in *Dye*, 82 Ohio St.3d 323, that the minimal force permissible under *Eskridge* applied not only to parent-child relationships but to any case in which the adult perpetrator had an authority relationship over a child. *Id.* at 327-329.

{¶ 22} *Wine* pointed out that the Eighth District initially used *Eskridge* and *Dye's* minimal force holdings to find sufficient evidence of force in cases involving sleeping children who woke up in the midst of being sexually abused by an authority figure. *See State v. Sullivan,* 1993 WL 398551 (8th Dist. Oct. 7, 1993); *State v. Lillard*, 1996 WL 273781 (8th Dist. May 23, 1996); *State v. Simpson*, 2007-Ohio-4301 (8th Dist.) But it thereafter used those cases to find sufficient evidence of force in cases involving sleeping adults. *Wine* at ¶ 48. *Wine* suggested that this was inappropriate and specifically took issue with the Eighth District's decisions in *Graves*, 2007-Ohio-5430 (8th Dist.) and *Clark*, 2008-Ohio-3358 (8th Dist.). *Id.* at ¶ 48-49.

{¶ 23} In *Graves*, the Eighth District relied on its decisions in *Sullivan* and *Simpson* -- again cases in which children woke up in the midst of being sexually abused by an authority figure -- to find that the State had presented sufficient evidence of forcible rape where a 28-year-old victim awoke to find her pants down to her knees and semen on her thighs, shirt, and the seat of the chair on which she was sitting. *Graves* at ¶ 4-9 and ¶ 15-18. Relying on *Sullivan* and *Simpson*, the Eighth District in *Graves* held that forcible

rape had been established because the defendant had "pulled down [the victim's] pants and separated her legs while she was asleep[.]" *Id.* at ¶ 17.

{¶ 24} In *Clark*, the Eighth District found sufficient evidence of forcible rape where the defendant moved a 19-year-old's pajamas and underwear while she was sleeping and inserted his finger into her vagina. *Clark* at ¶ 5-7, and ¶ 16-19. Relying upon *Graves*, *Simpson*, *Lillard*, and *Sullivan*, the Eighth District in *Clark* found that "the manipulation of a sleeping victim's clothing in order to facilitate sexual conduct constitutes force" and that, "where the victim is sleeping and thus not aware of the defendant's intentions, only minimal force is necessary to facilitate the act." *Id.* at ¶ 17. Ever since *Clark*, the Eighth District "has consistently held that in situations 'where the victim is sleeping and thus not aware of the defendant's intentions, only minimal force is necessary to facilitate the act' of rape." *Fortson*, 2010-Ohio-2337, at ¶ 74 (8th Dist.), quoting *Clark* at ¶ 17. *See also Clarke*, 2010-Ohio-5010, at ¶ 23 (8th Dist.); *Walker*, 2011-Ohio-6645, at ¶ 20 (8th Dist.); *B.J.*, 2021-Ohio-3926, at ¶ 39 (8th Dist.).

{¶ 25} *Wine* recognized that several Ohio appellate courts, including this one, have relied on the foregoing line of Eighth District cases in order to find sufficient evidence of force in cases where the victim was sleeping. *Wine,* 2012-Ohio-2837, at ¶ 49. But *Wine* also observed that those other courts have done so only in cases where the sleeping victim was a minor. *Id.*, citing *State v. Johnson*, 2010-Ohio-2920, ¶ 18 (2d Dist.) (16 years old); *State v. Burton*, 2007-Ohio-1660, ¶ 38 (4th Dist.) (10-13 years old); *State v. Green*, 2002-Ohio-3949, ¶ 60-61 (5th Dist.) (16 years old); *State v. H.H.*, 2011-Ohio-6660, ¶ 12 (10th Dist.) (17 years old); *State v. Rutan*, 1997 WL 781902, *1 (10th Dist. Dec. 16,

1997) (14-15 years old). *See also State v. Lauderdale*, 2024-Ohio-481, ¶ 35 (2d Dist.) (16 years old). *Wine*, therefore, draws a distinction between rape victims who are sleeping children and rape victims who are sleeping adults, a distinction that Simmons is attempting to use in his favor given that the sleeping victim in this case was an adult. Based on *Wine's* various concerns with the Eighth District's sleeping-victim case law, Simmons argues that this court should not apply that case law and should instead follow the analysis in *Wine*.

{¶ 26} In *Wine*, the sleeping victim was a 71-year-old woman who was wearing loose-fitting flannel pajama pants and no underwear when she woke up to find the defendant digitally penetrating her vagina. *Wine* at ¶ 8-10. The evidence in *Wine* established that, as soon as the victim woke up, the defendant withdrew his hands from her body and did not engage in any other sexual contact. *Id.* at ¶ 47. Based on this evidence, and upon rejecting the Eighth District's sleeping-victim case law, the Third District concluded that:

> "[S]ubtle and psychological" force found sufficient in *Eskridge* and *Dye* are insufficient here, because [the victim] was an adult and Wine was not in a position of authority over [her]. *Schaim*, 65 Ohio St.3d at 54-55, 600 N.E.2d 661. Rather, the State was required to prove beyond a reasonable doubt that Wine "use[d] physical force against [the victim], or create[d] the belief that physical force [would] be used if [the victim] [did] not submit" to establish the element of force. *Id.* at 55, 600 N.E.2d 661. The evidence presented at trial demonstrated that [the victim] was sleeping and

unaware of the sexual contact, and, as soon as she awoke, Wine withdrew his hands from her body, ending the sexual contact. Significantly, no sexual contact occurred after [the victim] was awake and aware of the sexual contact. [The victim's] will was not overcome by force or threat of force, nor did [the victim] "submit" to the sexual contact by force or threat of force. *Eskridge*, 38 Ohio St.3d at 58-59, 526 N.E.2d 304. The State also failed to produce sufficient evidence that Wine created the belief that physical force would be used if [the victim] did not submit to the sexual contact. *Schaim*, 65 Ohio St.3d at 55, 600 N.E.2d 661. While it is true that [the victim] was in a state of fear and duress after she awoke and realized Wine had sexually contacted her, [the victim's] fear and duress did not *cause* her to submit to the initial sexual contact or any further contact. Aside from that, [the victim] did not fear that Wine would continue the sexual contact but that Wine would kill her to conceal his already completed sexual contact. For these reasons, we conclude that the evidence is insufficient to establish that Wine purposely compelled [the victim] to submit to the sexual contact by (through the agency or instrumentality of) force or threat of force.

*Wine* at ¶ 47.

{¶ 27} In *State v. Stevens*, 2016-Ohio-446 (3d Dist.), the Third District distinguished its holding in *Wine* from circumstances where a sleeping adult victim woke up to find the defendant engaging in oral sex with her, thrusting up against her, and

inserting his penis into her vagina while she was in a groggy, dreamlike state. *Id.* at ¶ 27. The Third District in *Stevens* stated that:

> [A]lthough we concluded, in *Wine*, that the evidence was "insufficient to establish that Wine purposely compelled [the sleeping victim] to submit to the sexual contact by (through the agency or instrumentality of) force or threat of force," the facts presented by this case are distinguishable from *Wine*. *Wine*, 2012-Ohio-2837, 2012 WL 2371396, at ¶ 47. In *Wine*, the victim, who was "wearing a pair of [loose] pink flannel pajamas with nothing else underneath," awoke when she felt Wine's "finger inside her vagina." *Id.* at ¶ 10. The most notable difference is that the victim, in *Wine*, "was asleep during the entire time the sexual contact occurred." *Id.* at ¶ 51. Here, the victim was at least somewhat lucid and consciously aware of the sexual conduct, albeit in a groggy, dreamlike state. Second, *Wine* merely manipulated the victim's loose-fitting pajamas to execute the sexual contact; whereas, as we stated above, Stevens completely removed the victim's pants and underwear. Also different in this case is that, as the victim was beginning to wake up, Stevens changed sexual acts by thrusting up against her body to constrain her.
>
> Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Stevens engaged in sexual conduct with the victim and that Stevens purposely compelled the victim to engage in that sexual conduct by force or

threat of force, and therefore, committed rape under R.C. 2907.02(A)(2). *Stevens* at ¶ 27-28.

{¶ 28} More recently, the Third District in *State v. Cowan*, 2024-Ohio-2028 (3d Dist.) found sufficient evidence of forcible rape where the defendant pulled down a sleeping minor's pajama bottoms and underwear and manipulated the sleeping minor's body and legs. *Id.* at ¶ 31-32. The court found that those facts were "sufficient to demonstrate [the defendant] used force against his minor sleeping victim in order to compel her submission." *Id.* at ¶ 31. In so holding, the Third District did not discuss its decision in *Wine* but did stress the fact that the victim was not an adult and stated:

> Here, the victim was not an adult when she was sexually assaulted. She was a minor and still considered a child. The Ohio Supreme Court has stated that "it is nearly impossible to imagine the rape of a child without force involved," *State v. Dye*, 82 Ohio St.3d 323, 327, 695 N.E.2d 763 (1998), and the Court has noted "the coercion inherent in parental authority when a father sexually abuses his child," *State v. Eskridge*, 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988). " 'The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose.' " *Id.* at 59, 526 N.E.2d 304, quoting *State v. Etheridge*, 319 N.C. 34, 47, 352 S.E.2d 673 (1987)[.]

(Other citation omitted.) *Cowan* at ¶ 30.

{¶ 29} In *State v. Moore*, 2022-Ohio-2349 (5th Dist.), the Fifth District Court of Appeals found insufficient evidence of force for purposes of a gross-sexual imposition conviction under R.C. 2907.05(A)(1) where the 16-year-old victim was sleeping and awoke to the defendant, an uncle figure, groping her buttocks, putting his hand under her shorts and underwear, and touching her vaginal area. In reaching that decision, the court in *Moore* discussed *Wine*'s rejection of the Eighth District's sleeping-victim case law and stated the following:

> Even if we were to adopt the Eighth District's reduced level of force for initially sleeping victims, we find the facts here are distinguishable from any of the above-mentioned sleeping child-victim cases which appear to require manipulation of clothing plus something more, such as relocation of the victim or repositioning of the victim's limbs. While appellant did manipulate [the victim's] clothing, as soon as [the victim] became aware of the nature of appellant's conduct, she got up and left the room. T. 140. Appellant did not tell [the victim] to do or refrain from doing anything, did not restrain her in any way nor reposition or relocate her body in any way, and did not prevent [the victim] from leaving the room. He did not hold [the victim] down in order to commit the act of touching [her]. While we find appellant's conduct despicable, we nonetheless find the evidence presented by the state insufficient to prove force or threat of force.

*Moore* at ¶ 38; *Contra Lauderdale*, 2024-Ohio-481, at ¶ 35-41 (2d Dist.) (finding sufficient evidence of force under a similar factual scenario).

{¶ 30} The Fifth District also discussed *Wine* in *State v. Biggs,* 2022-Ohio-2481 (5th Dist.) and analyzed a similar scenario, albeit in reference to an adult victim who was *not* sleeping. In finding insufficient evidence to establish the force element of gross-sexual imposition, the court in *Biggs* stated:

> The instant case involves an adult victim, who was not asleep. There was no evidence Appellant removed [the victim's] clothing or manipulated her clothing beyond reaching inside her pajama pants and underwear. Appellant did not tell the victim to do anything or refrain from doing anything, and did not threaten her in any way if she failed to comply. Appellant did not move or manipulate the victim herself, or any of her limbs. There was no testimony Appellant held her down in order to commit the act of touching her. While [the victim] testified she forcibly removed Appellant's hand from inside her pajama pants, there is no evidence he struggled with her to continue touching her; rather, she was able to leave the room without interference from Appellant. Although [the victim] was flustered, crying, and scared because she did not expect the touching to happen, there is no evidence in the record Appellant employed any force or threat of force beyond the force of the act itself, which is legally insufficient to meet the "force" element of the crime of gross-sexual imposition. We find the evidence legally insufficient to convict Appellant of the crime of gross sexual imposition.

*Biggs* at ¶ 22.

{¶ 31} More recently, in *State v. Torres*, 2023-Ohio-1406 (4th Dist.), the Fourth District Court of Appeals discussed the analyses in *Wine*, *Biggs*, and *Moore* and observed that those cases were "instructive and relevant . . . where the victim is not a child and the considerations relevant to child victims as recognized in *Eskridge*, and *Dye* . . . are inapplicable." *Id.* at ¶ 59. We agree with that observation.

{¶ 32} In *Torres*, the sleeping victim was in her mid-twenties and was wearing baggy shorts and no underwear when she woke up to the defendant penetrating her vagina with his finger. *Id.* at ¶ 58. The evidence presented at trial established that the defendant withdrew his finger from the victim's vagina as soon as the victim woke up. *Id.* at ¶ 60. The evidence also demonstrated that the defendant did not tell the victim to do anything or refrain from doing anything and did not threaten her in any way if she failed to comply. *Id.* There was also no evidence indicating that the defendant held the victim down or that the defendant struggled with the victim. *Id.* Rather, the victim testified that she was able to leave the room without interference from the defendant and that no sexual conduct occurred after she was awake and aware of the defendant's presence. *Id.* Based on this evidence, the Fourth District in *Torres* found that there was legally insufficient evidence to convict the defendant of rape in violation of R.C. 2907.02(A)(2). *Id.* The court reached this conclusion because the evidence did not establish that the victim's will was overcome by force or threat of force or that the victim submitted to the sexual conduct by force or threat of force. *Id.* The court also stated that:

> Even if we were to adopt the Eighth District's reduced level of force
> for initially sleeping victims as discussed and criticized by *Wine, Biggs* and

*Moore*, the facts here are distinguishable from the sleeping-child victim cases which require manipulation of clothing and something more, such as moving the victim or repositioning the victim's limbs. There was no evidence Torres removed [the victim's] clothing or manipulated her clothing. We know that Torres reached into her sweat shorts, but the record does not establish whether Torres reached up into the loose leg of her shorts or down into the waist of her shorts. Thus, it is not known whether any clothing manipulation was required for Torres to commit the act. Even if we presume Torres moved her shorts slightly, the reduced level of force adopted by the Eighth District also requires the manipulation or movement of the victim's body. Here, there was no evidence Torres moved or manipulated [the victim] or any of her limbs. When [the victim] awoke, sat up, and confronted Torres, he immediately removed his finger. Although [the victim] was crying and had difficulty speaking, there is no evidence that Torres employed any force or threat of force beyond the force of the act itself, which is legally insufficient to meet the "force" element of the crime of rape and gross sexual imposition under R.C. 2907.02(A)(2) and R.C. 2907.05(A)(1). Thus, even under the reduced standard adopted by the Eighth District, we find the evidence legally insufficient to convict Torres of the crime of rape and gross sexual imposition.

*Id.* at ¶ 61.

{¶ 33} Upon review, we find that the instant case is most similar to *Torres* and

*Wine.* Like the sleeping adult victims in those cases, 21-year-old M.H. woke up to a perpetrator, Simmons, digitally penetrating her vagina. Also like those cases, there was no evidence indicating that Simmons had threatened M.H. or engaged in any struggle, restraint, or sexual conduct with M.H. after she woke up. In addition, there was no evidence that Simmons ever moved or relocated any part of M.H.'s body.

{¶ 34} M.H. did, however, testify that she fell asleep partially curled up on her living room couch wearing a tennis skirt and underwear with a blanket overtop her. Given the nature of the offense, and when viewing M.H.'s testimony in a light most favorable to the State, a rational factfinder could have found that, at the very least, Simmons had to have manipulated M.H.'s underwear in order to digitally penetrate her vagina and thus used some amount force during the offense. That, however, is not the end of the inquiry.

{¶ 35} In order to commit rape in violation of R.C. 2907.02(A)(2), the force used by Simmons must have *compelled* M.H. to submit to the sexual conduct in question. The Supreme Court has explained that regardless of the amount of force used, " '[a]s long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.' " *Eskridge*, 38 Ohio St.3d at 58-59, citing *Fowler*, 27 Ohio App.3d at 154, citing *Martin*, 77 Ohio App. 553 (9th Dist.). Although that principle was announced in *Eskridge*, a case that concerned a child rape victim and the minimal force needed to establish rape by a parent/authority figure, "the Court's statement regarding overcoming the victim's will was not specified to apply only to position of authority over children cases. It was set forth as general law." *State v. Rupp*, 2007-Ohio-1561, ¶ 28 (7th Dist.). *Accord State v. Heiney,* 2018-Ohio-3408, ¶ 108 (6th Dist.);

*Wine,* 2012-Ohio-2837, at ¶ 40 (3d Dist.). Therefore, we agree with *Wine's* observation that submitting to sexual conduct by force or threat of force requires force or threat of force that is sufficient to overcome the will of the victim. *Wine* at ¶ 49, citing *Eskridge* at 58-59. We also agree that the Eight District's sleeping-victim line of cases overlooks this requirement.

{¶ 36} The evidence in this case did not establish that the force used by Simmons to manipulate M.H.'s underwear compelled M.H. to submit to the sexual conduct in question. This is because M.H. was asleep and was unaware of what was happening when Simmons manipulated her underwear to facilitate the sexual conduct. Because M.H. was unaware of that force, her submission to the sexual conduct could not have been compelled by it. Rather, the evidence established that M.H. submitted simply because she was sleeping. *Compare State v. Dyer*, 2021-Ohio-2329, ¶ 18-21 (2d Dist.) (where adult rape victim was awake and was compelled to submit to sexual conduct as a result of the defendant's using force to pull down the victim's pants while she was bending over in a vulnerable position).

{¶ 37} A sleeping person is considered "substantially impaired" and is protected under section (A)(1)(c) of the rape statute. *State v. Hines*, 2018-Ohio-1780, ¶ 19-20 (12th Dist.); *State v. Brown*, 2017-Ohio-1114, ¶ 46 (5th Dist.); *H.H.*, 2011-Ohio-6660, at ¶ 10 (10th Dist.); *State v. Wright*, 2004-Ohio-603, ¶ 6 (9th Dist.). *See also State v. Coran*, 2014-Ohio-4406, fn. 3 (2d Dist.), citing *State v. Porter*, 2013-Ohio-3969, ¶ 19 (9th Dist.). However, Simmons was not charged with rape in violation of R.C. 2907.02(A)(1)(c). He was charged with forcible rape in violation of R.C. 2907.02(A)(2), which requires evidence

that he overcame M.H.'s will using some amount of force. Simmons's taking advantage of M.H. while she was sleeping was despicable but, under the specific circumstances of this case, it was not tantamount to overcoming her will by force as is required for a violation of R.C. 2907.02(A)(2). Accordingly, we find that even viewing the evidence in a light most favorable to the State, there was insufficient evidence to convict Simmons of forcible rape.

{¶ 38} Simmons's first assignment of error is sustained.

## Second Assignment of Error

{¶ 39} Under his second assignment of error, Simmons argues that his rape conviction should be reversed because the trial court improperly instructed the jury that manipulating a sleeping victim's clothing to facilitate sexual conduct constituted force under R.C. 2907.02(A)(2). Because we have already found that there was insufficient evidence to support Simmons's rape conviction under R.C. 2907.02(A)(2), his second assignment of error is overruled as moot.

## Third Assignment of Error

{¶ 40} Under his third and final assignment of error, Simmons contends that the trial court erred by excluding certain lay witness opinion testimony during his trial. Specifically, Simmons takes issue with the trial court's precluding one of the investigating officers from testifying as to whether it was possible for evidence of saliva to be found during a sexual assault examination and whether potential sources of DNA could have

been looked for had M.H. undergone a sexual assault examination. Simmons also takes issue with the trial court's precluding the officer from testifying as to whether he could have asked M.H. to submit her clothes for DNA testing "in a way that wasn't pressuring," as the officer had testified that he was "not going to sit and press a woman to do something that she doesn't feel comfortable doing . . . [f]or . . . possible evidence being collected." Trial Tr. p. 243.

{¶ 41} In support of his argument, Simmons cites case law from this court stating that " '[i]t is well-settled that a police officer may testify concerning matters that are within his experience and observations that may aid the trier of fact in understanding the other testimony pursuant to Evid.R. 701.' " *State v. Jones*, 2015-Ohio-4116, ¶ 108 (2d Dist.), quoting *State v. Tatum*, 2011-Ohio-907, ¶ 17 (10th Dist.) *Accord State v. Stone*, 2024-Ohio-177, ¶ 36 (2d Dist.). Simmons claims that under Evid.R. 701, the excluded testimony was proper lay witness opinion testimony given that the officer testified to having 20 years of police experience and to assisting with "well over a couple of dozen" sexual assault investigations. Trial Tr. p. 232, 241. Simmons asserts that the excluded lay opinion testimony was a permissible means to attack the thoroughness of the police investigation. Albeit indirectly, Simmons also suggests that the excluded lay opinion testimony would have indicated to the jury that he may have been exonerated had M.H. undergone a sexual assault examination and/or had her clothing collected for DNA testing.

{¶ 42} "Evid.R. 701 provides that opinion testimony by a lay witnesses 'is limited to those opinions or inferences which are (1) rationally based on the perception of the

witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.' " *State v. Johnson*, 2022-Ohio-4629, ¶ 36 (2d Dist.), quoting Evid.R. 701. "Because '[p]erception connotes sense: visual, auditory, olfactory, etc. . . . [,] opinion testimony under Evid.R. 701 must be based on firsthand, sensory based knowledge." *Id.*, quoting *Sec. Natl. Bank & Trust Co. v. Reynolds*, 2008-Ohio-4145, ¶ 17 (2d Dist.). If a lay witness's opinion is not "rationally based upon first-hand perceptions by the witness. . . the opinion is speculation, and as such cannot be 'helpful to a . . . determination of a fact in issue.' " *State v. Hall*, 2004-Ohio-663, ¶ 8 (2d Dist.), quoting Evid.R. 701.

{¶ 43} "Trial courts have 'considerable discretion in admitting the opinion testimony of lay witnesses.' " *Brown v. Burnett*, 2020-Ohio-297, ¶ 65 (2d Dist.), quoting *State v. Marshall*, 2010-Ohio-5160, ¶ 43 (2d Dist.). "We, therefore, evaluate the court's decision [on that matter] for abuse of discretion[.]" *Id.*; *City of Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 113 (1989). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 2013-Ohio-966, ¶ 34.

{¶ 44} As previously discussed, the trial court precluded the investigating officer from testifying as to whether it was possible for evidence of saliva to be found during a sexual assault examination and whether potential sources of DNA could have been looked for during a sexual assault examination. In support of the trial court's decision, the State argues that the officer did not have sufficient first-hand knowledge or experience to give a lay opinion on those matters. We disagree. Given the officer's experience, he

would have been familiar with the kind of evidence found and looked for during sexual assault examinations. We also find that the officer's excluded testimony as to whether he could have asked M.H. to submit her clothing for DNA testing in a non-pressuring manner was based on his first-hand knowledge/experience, given that he was one of the responding officers who spoke with M.H. on the morning of the reported offenses.

{¶ 45} Simmons, however, sought to elicit the excluded lay opinion testimony not only to attack the thoroughness of the police investigation but as a means to suggest the possibility of his exoneration had M.H. undergone a sexual assault examination and/or had her clothing been collected for DNA testing. Because no sexual assault examination or DNA testing ever took place, the possibility of Simmons being exonerated by the results of any such examination or testing was pure speculation, as it was just as likely that the results would have confirmed Simmons's guilt. Speculation about nonexistent test results and their effect on a case is not evidence. *See Lakota Local School Dist. Bd. of Edn. v. Butler Cty. Bd. of Revision*, 2006-Ohio-1059, ¶ 15 ("Mere speculation is not evidence."); *Williams v. Ormsby*, 2012-Ohio-690, ¶ 11 ("Speculation and innuendo are not evidence."). Accordingly, it was reasonable and not an abuse of discretion for the trial court to exclude any testimony that encouraged such speculation.

{¶ 46} Even if the trial court had erred by excluding the lay opinion testimony at issue, any such error would be harmless because Simmons did not suffer any prejudice. *See State v. Sibole*, 2018-Ohio-3203, ¶ 12 (2d Dist.) ("An error may be disregarded as harmless error if a defendant has not suffered any prejudice as a result."), citing *State v. Morris*, 2014-Ohio-5052, ¶ 25. Simmons was not prejudiced because the officer

provided most of the sought-after testimony during the following unobjected-to portion of his cross-examination.

Q.     Okay.   And you offered to escort [M.H.] to Miami Valley Hospital?

A.     Yes.

Q.     To conduct a rape kit, or a sexual assault kit, right?

A.     Examination.   Correct.

Q.     And you said you've done a number of – you responded or assisted in a number of sexual assault cases.

A.     Correct.

Q.     And you know the importance of an examination then?   Is that a yes?

A.     Yes.

Q.     Okay.   Even with digital penetration, a hospital can check for trauma to the vaginal area, correct?

A.     Right.

Q.     And look for scratches?

A.     Yeah.

Q.     And they look for scrapes?

A.     Absolutely.

Q.     Swelling?

A.     Yes.

Q.     Abrasions?

A. Yes.

Q. Cuts?

A. Yes.

Q. Bruising or irritation at all?

A. Yes, all that's correct.

Q. Okay. And also the other – there's other evidence that can be searched for?

A. Correct.

Q. They could check to see if there was any DNA evidence, correct?

A. Correct.

Q. Even though there wasn't penile penetration, it was digital penetration?

A. Correct.

Q. It could have been hair from somebody's hand or arms?

A. Potential.

Q. Or hair on somebody's head?

A. Potentially.

. . .

Q. And the hospital could have checked [M.H.'s] body?

A. Correct.

Q. And even if [M.H.] didn't want to go, you could have taken her clothes to be examined?

A.    As a victim of sexual assault, I'm not going to make a female do things they don't want to do.

Q.    But you could have asked?

A.    Could have.

Q.    But you didn't?

A.    No, didn't ask that specifically.   We asked in a caring manner, is this something you want to do, and she made it clear she did not.   And I'm not going – I'm not going to sit and press a woman to do something that she doesn't feel comfortable doing.

. . .

Q.    [M.H.] declined to go to the hospital?

A.    Correct.

Q.    And at that point you wrapped up your part of the investigation and you began to leave?

A.    Correct.

Trial Tr. p. 242-244.

{¶ 47} We also find that the trial court's decision to exclude the lay opinion testimony at issue did not prevent Simmons from attacking the thoroughness of the police investigation, as Simmons's counsel was permitted to make the following comments during closing argument:

So I want to talk a little bit now about, you know, DNA evidence.   I know we touched on it a little bit during voir dire, and you know, you heard

some testimony from the officers asking about, you know, a sexual assault kit. Look and see, without finding any, you know, physical proof of any kind of rape. And you know, he didn't – as the officers testified, you can get DNA even through digital penetration. We talked a little bit about it. You know, sweat, hair, saliva, things can appear. And yeah, she didn't want to have an exam.

You know, also, they could have done a vaginal exam, looked to see if there was any, you know, trauma to that area that would come from a rape, I mean, with digital penetration. But again, she didn't want to. She's not obligated to. But it was important, and again, two officers asked her.

You know, as the testimony was, the police didn't ask even just, hey, if you don't want to go, I get it; you have a lot to do. Can we just take your clothes and just examine those? That didn't come up. And I know Sgt. Swank mentioned, I don't want to, you know, force them there; make them feel like I'm bullying them into, you know getting an exam done or giving clothes up. And I get that, too.

But as Sgt. Swank said, he has experience with these types of cases. You'd think that he would be able to say something, you know, without force and with concern. We'd like to get some evidence. This might help the case. You know, but if we could just get the clothes we can look. Might find something. To be able to broach it to a lady that is no, again, forcing or bullying someone into doing it, but still giving them a chance to

investigate the case fully.

. . .

> There's not DNA on every single case.  It's not necessary.  But it would be helpful if we had some information, wouldn't it?  It'd be helpful, even if it was inconclusive, that [M.H.] was so sure something happened she wanted somebody to examine, just to see.  But again, you know, the police didn't want to harass her, but again, they could have had a discussion about the importance of at least dropping some clothes off.

Trial Tr., p. 306-307, 309-310.

{¶ 48} Because the excluded lay opinion testimony was essentially provided during other parts of the officer's cross-examination, and because Simmons's purpose for attempting to elicit the excluded lay opinion testimony was otherwise achieved during trial, Simmons was not prejudiced by the trial court's decision to exclude it.  Accordingly, any error in excluding the testimony would be harmless and not warrant any relief.

{¶ 49} Simmons's third assignment of error is overruled.


## Conclusion

{¶ 50} Having sustained Simmons's first assignment of error and overruled his second and third assignments of error, Simmons's conviction for forcible rape in violation of R.C. 2907.02(A)(2) is vacated.  The matter shall be remanded to the trial court so that the court can: (1) consider whether the vacation of the forcible rape conviction affects the merged aggravated burglary offense for which Simmons was found guilty and, if

necessary, whether the guilty verdict for sexual battery supports a lesser-included offense of aggravated burglary; and (2) sentence Simmons for the offenses that merged into his forcible rape conviction.

. . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.